[No. B104051. Second Dist., Div. Five. Dec. 19, 1996.]

PETE WILSON, as Governor, etc., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES TIMES, Real Party in Interest.

1138

## COUNSEL

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Ted Prim, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Baker & Hostetler, Glen A. Smith and Dennis F. Hernandez for Real Party in Interest.

## OPINION

**ARMSTRONG, J.**—In a request made pursuant to the California Public Records Act (Gov. Code, § 6250 et seq.),[1] the Los Angeles Times (the Times) sought disclosure of, among other documents, copies of applications submitted to Governor Pete Wilson by persons seeking appointment to the vacancy on the Orange County Board of Supervisors created by the retirement of Supervisor Gaddi Vasquez. When Governor Wilson (through his deputy legal affairs secretary) declined to grant the Times access to the documents, the Times filed a petition for writ of mandate in respondent court. In this proceeding, the Governor challenges respondent court's judgment granting the Times's petition. We hold the applications are exempt from disclosure under the act's "public interest" or "catchall" exemption (§ 6255) because they are subject to the "deliberative process privilege" (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325 [283 Cal.Rptr. 893, 813 P.2d 240]) and that the public interest in nondisclosure clearly outweighs the public interest in disclosure.

### FACTS AND PROCEDURAL BACKGROUND

In the summer of 1995, Orange County Supervisor Gaddi Vasquez announced his retirement from the board of supervisors. On August 29, 1995, Eric Bailey, a staff writer for the Sacramento bureau of the Los Angeles Times, made a request under the California Public Records Act for "access to documents which describe or contain the names and background information about the persons who have applied for the soon-to-be-vacant 3rd Supervisorial District seat in Orange County." An exchange of letters ensued between the Times (through its associate general counsel, Karlene Goller) and the Governor (through his deputy legal affairs secretary, Dale Bonner), concerning whether the act compelled the Governor to disclose these documents.

On October 10, 1995, the Governor appointed Don Saltarelli to fill the vacancy created by the retirement of Supervisor Vasquez.

On March 1, 1996, five months after the Governor appointed Mr. Saltarelli, the Times filed a petition for writ of mandate in respondent court.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

The matter was heard May 23, 1996. The hearing was brief and the matter was submitted on the papers filed.[2]

On May 28, 1996, respondent court issued its ruling granting the petition as to the application forms only. In its minute order, the court stated: "The completed application form by persons applying to the Governor's Office for appointment does not impinge on the 'deliberative process.' Further, although the applications are directed to the Governor's Office BEFORE the decision was to have been made, they do not amount to 'communications to the decision maker prior to the decision' as provided in TIMES MIRROR CO. v. SUPERIOR COURT, 53 Cal.3d 1325 [283 Cal.Rptr. 893, 813 P.2d 240]. [¶] In addition the applications are not 'correspondence' of and to the Governor's Office within the meaning of Government Code section 6254(1). Moreover, Evidence Code section 1040 is not applicable because the applications are not submitted in confidence. Indeed, the application form 'Authorization and Release' paragraph makes it clear that the information provided is not confidential as well as information obtained from other specific sources."

The "Authorization and Release" paragraph to which the court referred provides: "I understand that in connection with this application for appointment an extensive investigation of my personal and business background will be conducted. I hereby authorize the release of any and all information pertaining to me or businesses in which I participated, including information of a confidential or privileged nature in the possession of government or private agencies or individuals. I hereby release all such agencies or individuals who furnish such information from liability for damages which may result from furnishing the information requested. You are also being notified that a consumer credit report may be requested and used in connection with this application for appointment. The source of the report shall be a major national credit reporting agency, such as TRW, TRANSUNION, or EQUIFAX. In the event such a request is made, a copy of the report should be provided to you by the credit agency."

On July 9, 1996, the court entered a judgment granting the peremptory writ. Although the court's order is denominated a "judgment," the order is not appealable and is reviewable only by way of a petition for writ of mandate. Government Code section 6259, subdivision (c), provides that an order "either directing disclosure by a public official or supporting the decision of the public official refusing disclosure, is not a final judgment or order within the meaning of Section 904.1 of the Code of Civil Procedure

---

[2]The Governor's exhibits included a blank application form, but not the completed applications themselves.

from which an appeal may be taken, but shall be immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ." The petition must be filed within 20 days of service of notice of entry of the court's order. The court's judgment was served on the Governor on July 9, 1996. This petition, filed July 29, 1996, is therefore timely.

Having conducted an independent review of respondent court's judgment (*Times Mirror Co.* v. *Superior Court, supra,* 53 Cal. 3d at p. 1336; *Rogers* v. *Superior Court* (1993) 19 Cal.App.4th 469, 475 [23 Cal.Rptr.2d 412]), we conclude the court's determination that the Times's request "does not impinge on the 'deliberative process'" is not supported by substantial evidence. Accordingly, we grant the petition.[3]

## DISCUSSION

■ The California Public Records Act (the Act) is modeled after the federal Freedom of Information Act (FOIA). Because the two have a common purpose, federal decisions under the FOIA may be used to construe the Act. "The legislative history and judicial construction of the FOIA thus 'serve to illuminate the interpretation of its California counterpart.'" (*Times Mirror Co.* v. *Superior Court, supra,* 53 Cal. 3d at p. 1338.)

■ The Act was enacted in 1968 "for the explicit purpose of 'increasing freedom of information' by giving the public 'access to information in possession of public agencies.'" (*CBS, Inc.* v. *Block* (1986) 42 Cal.3d 646, 651 [230 Cal.Rptr. 362, 725 P.2d 470].) The Act was intended to safeguard the accountability of government to the public, and it makes public access to governmental records a fundamental right of citizenship. (*Rogers* v. *Superior Court, supra,* 19 Cal.App.4th at p. 476.) The Legislature declared in enacting the measure that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250.) The Act provides that "every person has a right to inspect any public record, except as hereafter provided." (§ 6253) Thus, public records must be disclosed unless they come within one or more of the categories of documents exempt from disclosure. (§ 6254) ■ In addition, section 6255, referred to in *Times Mirror* as the "public interest" or "catchall" exemption (53 Cal.3d at pp. 1337-1338), provides a means by which an agency may withhold a public record which would not be exempt under any of the specific exemptions delineated in section 6254, if the agency makes a showing that "on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

---

[3]Having determined that the applications are protected by the deliberative process privilege, we need not address the other points of respondent court's judgment.

■ Section 6255 exempts from disclosure documents which are protected by the deliberative process privilege. (*Times Mirror Co.* v. *Superior Court, supra*, 53 Cal. 3d 1325.) The deliberative process privilege (known as "executive privilege" under federal law) protects materials reflecting deliberative or decisionmaking processes. (*EPA* v. *Mink* (1973) 410 U.S. 73 [35 L.Ed.2d 119, 93 S.Ct. 827].)

The key question in every case is " 'whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' " (*Times Mirror Co.* v. *Superior Court, supra*, 53 Cal.3d 1325, 1342, citing *Dudman Communications* v. *Dept. of Air Force* (D.C. Cir. 1987) 815 F.2d 1565, 1568 [259 App.D.C. 364].) Although the deliberative process privilege is designed to protect materials reflecting deliberative or policymaking processes, and not "purely factual, investigative matters" (*EPA* v. *Mink, supra*, 410 U.S. at p. 89 [35 L.Ed.2d at p. 133]), the privilege has been held to protect factual information which "compromises the deliberative process," including "predecisional" documents, that is, documents which are prepared to assist an agency decisionmaker in making a decision. "To prevent injury to the quality of executive decisions, the courts have been particularly vigilant to protect communications to the decisionmaker before the decision is made. 'Accordingly, the . . . courts have uniformly drawn a distinction between predecisional communications, which are privileged [citations]; and communications made after the decision and designed to explain it, which are not.' . . ." (*Times Mirror Co., supra*, 53 Cal.3d at p. 1341, citation omitted.) "As Professor Cox in his seminal article on executive privilege has explained, protecting the predecisional deliberative process gives the chief executive 'the freedom to "think out loud," which enables him to test ideas and debate policy and personalities uninhibited by the danger that his tentative but rejected thoughts will become subjects of public discussion. Usually, the information is sought with respect to past decisions; the need is even stronger if the demand comes while policy is still being developed.' " (*Ibid.*, citing Cox, *Executive Privilege* (1974) 122 U. Pa. L.Rev. 1383, 1410.)

In *Times Mirror Co., supra*, the Supreme Court held that the contents of a document, even though purely factual, may be exempt from disclosure if they are "actually . . . related to the process by which policies are formulated" or "inextricably intertwined" with policymaking processes. (*Times Mirror Co.* v. *Superior Court, supra*, 53 Cal.3d at p. 1342.) Applying that rule, the court held that the deliberative process privilege protected the Governor's schedules and appointment calendars: "Disclosing the identity of persons with whom the Governor has met and consulted is the functional

equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information would indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment. The intrusion into the deliberative process is patent." (*Times Mirror Co., supra*, 53 Cal.3d at p. 1343.)

■ The applications in issue here present at least as compelling an argument for application of the privilege as did the schedules and appointment calendars at issue in *Times Mirror*: The applications are predecisional documents whose sole purpose is to aid the Governor in selecting gubernatorial appointees, a process which depends upon comparison of the qualifications of the candidates as shown in the applications and confidential, candid discussion of the candidates' professional competence, political views and private conduct.

The application form itself solicits highly personal and occasionally embarrassing information regarding the applicant's background, political beliefs and associations. This includes medical history and financial information otherwise protected by the constitutional right of privacy. An applicant answers candidly with the expectation that his or her responses will remain confidential.

In support of the Governor's opposition to the Times's petition, the Governor's appointments secretary, Julia Justus, stated that both the candidates and those who provide information about them are assured that any information provided will be divulged only to the Governor and his senior staff. This assures that applicants will be forthcoming and enhances the Governor's ability to attract the most qualified applicants and to make educated and informed choices in selecting his appointees. Were that not the case, the pool of qualified applicants would quickly dwindle, the remaining applicants would not provide candid or truthful responses, and the public would not be assured of the qualified public servants to which it is entitled. Moreover, the threat of public disclosure would only encourage secrecy and the type of "back room" decisionmaking which the Act was designed to eliminate.

The Times argues that applicants for a highly visible public office should expect that their qualifications and background will be subjected to close public scrutiny. We do not disagree. There is a considerable difference, however, between an applicant's disclosing such information to the Governor for purposes of a possible political appointment, and having such information disseminated in the press.

The Times also argues that the importance of public access to information regarding high government posts is manifest and that the appointment of an

individual (one of only five) to the board of supervisors of a county emerging from bankruptcy is of utmost public interest. Again, we do not disagree. The question, however is whether the public interest in disclosure of these applications clearly outweighs the public interest in nondisclosure. In resolving this issue we take the pragmatic approach approved by the Supreme Court in *Times Mirror:* "The deliberative process privilege is grounded in the unromantic reality of politics; it rests on the understanding that if the public and the Governor were entitled to precisely the same information, neither would likely receive it. Politics is an ecumenical affair; it embraces persons and groups of every conceivable interest: public and private; popular and unpopular; Republican and Democratic and every partisan stripe in between; left, right and center. To disclose *every* private meeting or association of the Governor and expect the decisionmaking process to function effectively, is to deny human nature and contrary to common sense and experience. [Citation.]" (*Times Mirror* v. *Superior Court, supra,* 53 Cal.3d at p. 1345.) As the Legislature recognized when it enacted section 6255, and the Supreme Court recognized when it decided *Times Mirror,* there are instances in which, despite the Act's clear mandate for disclosure, documents must be subjected to a balancing test to determine whether the public interest served by not making the document public clearly outweighs the public interest served by disclosing it. (*Times Mirror, supra,* 53 Cal.3d at p. 1344.) Having conducted the balancing test compelled by *Times Mirror,* we conclude the applications in question should not be made public.

### DISPOSITION

Let a peremptory writ issue directing respondent court to vacate its judgment entered July 9, 1996, and enter a new and different order denying the petition of the Los Angeles Times for a writ of mandate. Each party to bear its own costs of this proceeding.

Godoy Perez, J., concurred.

**TURNER, P. J.,** Concurring and Dissenting.—

### I. INTRODUCTION

I respectfully dissent from that part of my colleagues' opinion which resolves the weighing process required by Government Code section 6255[1] without an in camera review of the applications at issue. My colleagues

---

[1]Government Code section 6255 states: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this

correctly have engaged in independent review of the respondent court's decision. (*Times Mirror Co.* v. *Superior Court* (1991) 53 Cal.3d 1325, 1336 [283 Cal.Rptr. 893, 813 P.2d 240]; *CBS, Inc.* v. *Block* (1986) 42 Cal.3d 646, 650-651 [230 Cal.Rptr. 362, 725 P.2d 470].) I agree with my colleagues that the documents which the Governor reviewed are subject to the deliberative process privilege. (*NLRB* v. *Sears, Roebuck & Co.* (1975) 421 U.S. 132, 150 [44 L.Ed.2d 29, 47, 95 S.Ct. 1504]; *Times Mirror Co.* v. *Superior Court, supra*, 53 Cal.3d at pp. 1339-1343.) In this regard, I respectfully disagree with the legal conclusion of the respondent court. However, once that legal conclusion is made, the remaining step is to determine pursuant to section 6255 whether the public interest served by nondisclosure clearly outweighs the legitimate civic justification for disclosing the documents reviewed by the Governor prior to making the appointment. (53 Cal.3d at pp. 1344-1346.) Neither the respondent court, my colleagues, nor I have reviewed the documents read by the Governor before he made the appointments. Hence, unlike my colleagues, I cannot conclude that the public interest in nondisclosure outweighs the justification for disclosure. Therefore, I would: reverse the judgment and remand to allow the respondent court to read the documents in camera as permitted by section 6259, subdivision (a)[2] reviewed by the Governor prior to the appointment;[3] permit the respondent court to make appropriate factual and legal findings; and, if the parties are dissatisfied, they can seek immediate appellate review pursuant to a petition for writ of mandate. Further, during the in camera review of the documents reviewed by the Governor prior to the appointment, the respondent court can determine whether there is any data which might constitute an unwarranted invasion of privacy of an applicant or more likely a family member protectable under either the state Constitution or section 6254. (Cal. Const., art. I, § 1; *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 42-44 [32 Cal.Rptr.2d 200, 876 P.2d 999]; *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 37 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

---

chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record." Unless otherwise noted, all future statutory references are to the Government Code.

[2]Section 6259, subdivision (a), which permits for in camera review of documents, states: "Whenever it is made to appear by verified petition to the superior court of the county where the records or some part thereof are situated that certain public records are being improperly withheld from a member of the public, the court shall order the officer or person charged with withholding the records to disclose the public record or show cause why he or she should not do so. The court shall decide the case after examining the record in camera, if permitted by subdivision (b) of Section 915 of the Evidence Code, papers filed by the parties and any oral argument and additional evidence as the court may allow."

[3]On May 23, 1996, a hearing was held before the respondent court on the mandate petition filed by the Los Angeles Times to compel disclosure of the documents relied upon by the Governor in filling the vacancy on the Orange County Board of Supervisors. At the May 23, 1996, hearing, the Los Angeles Times suggested possible in camera review to the respondent court of the documents relied upon by Governor Wilson in making the appointment.

## II.  THE DELIBERATIVE PROCESS ISSUE

The crucial authority concerning the "deliberative process" factor to be weighed in determining whether to order disclosure of the Governor's records is that articulated by the California Supreme Court's decision in *Times Mirror Co.* v. *Superior Court, supra,* 53 Cal.3d at pages 1339-1343. Although it is difficult to synthesize that important jurisprudence, the following are the salient points articulated by our Supreme Court: There is a " 'deliberative process' " privilege; the privilege may, depending on the circumstances, extend to documents read by a Governor prior to making a decision; there is a greater secrecy interest as to documents involving decisions that are yet to be made than in regard to past determinations by a governor; documents reflecting " 'purely factual, investigative matters' " are treated differently from papers reflecting deliberative or policy making processes; yet, the privilege may extend to purely factual matters which reflect the policy making process. (*Ibid.*) The key test articulated by the Supreme Court in *Times Mirror Co.* was as follows: "The key question in every case is 'whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' [Citation.] Even if the content of a document is purely factual, it is nonetheless exempt from public scrutiny if it is 'actually . . . related to the process by which policies are formulated' [citation] or 'inextricably intertwined' with 'policy-making processes.' [Citations.]." (*Id.* at p. 1342.)

The holding in *Times Mirror Co.* is conclusive in terms of whether the documents relied upon by Governor Wilson in making the appointment are subject to the deliberative process privilege in this case. In *Times Mirror Co.,* the issue was whether disclosure could be compelled of then Governor George Deukmejian's "daily, weekly and monthly appointment calendars and schedules" between January 1983 and August 1988. (*Times Mirror Co.* v. *Superior Court, supra,* 53 Cal.3d at p. 1329.) After analyzing federal decisional authority, the Supreme Court held, "The parallel here is evident. Disclosing the identity of persons with whom the Governor has met and consulted is the functional equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information would indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment. The intrusion into the deliberative process is patent." (*Id.* at p. 1343.) The same is true in this case. By revealing the contents of the applications of the successful applicant, if he filed one, and those who were rejected, the very documents used by the Governor to make the decisions would be revealed. The *Times Mirror Co.* test extends to documents " 'related to the process by which policy policies

are formulated' " which are " 'inextricably intertwined' with the 'policy-making processes.' " (*Id.* at p. 1342.) The documents at issue certainly fall within that test.

Of additional consequence, the very purpose for which the documents are sought is to report on the decisionmaking process. The request had its genesis in the appointment by Governor Pete Wilson of former Tustin City Council Member Don Saltarelli to the Orange County Board of Supervisors. Prior to the appointment, the Orange County edition of the Los Angeles Times carried a story on how to apply to Governor Wilson for the vacancy on the Orange County Board of Supervisors. On October 12, 1995, the Orange County edition of the Los Angeles Times carried an article which described the appointment of Supervisor Saltarelli to the Orange County Board of Supervisors. The article related the views of those who supported and opposed the appointment. The article also adverted to Supervisor Saltarelli's past relationship with the Irvine Company. The article stated: "Saltarelli, who served 15 years on the Tustin council from 1972 to 1987, has worked in real estate since 1972 and for half a dozen years as a stockbroker. He has also run a part-time consulting business since 1988-89 and is now a resident of Orange. [¶] In recent years, he has worked on land-use permit issues in Tustin for the Irvine Co., the development giant headed by Wilson benefactor and Newport Beach billionaire Donald Bren. Saltarelli's stint as a consultant for the firm has been no secret, and on Wednesday sparked some hard feelings among residents who believe the Irvine Co. holds too much sway in local and state government. [¶] 'This is a major mistake by Gov. Wilson,' said Patrick Quaney, local issues coordinator of the Orange County Chapter of United We Stand America. 'This is an Irvine Co.-initiated appointment, in my opinion. It is an attempt to maintain the status quo.' [¶] . . . [¶] Others suggested that any boost Saltarelli got from the Irvine Co. shouldn't overshadow his attributes. [¶] 'I think having a relationship with the Irvine Co. certainly doesn't hurt,' said Doy Henley, president of the Lincoln Club of Orange County, an influential Republican organization whose members are generally wealthy political contributors. 'But I think he will serve all of the people. He'll do a good job.' [¶] Irvine Co. officials and a spokesman for the governor downplayed any role the company might have had. Larry Thomas, an Irvine Co. spokesman, said the governor's staff asked the firm for a reaction on half a dozen different finalists. [¶] 'We told them that all of the one's with whom we were familiar would have been sound appointments,' Thomas said. 'We didn't advocate a single candidate nor did we oppose any potential candidate.' [¶] 'A number of political and business leaders in the community were consulted,' added Paul Kranhold, Wilson's spokesman. 'Mr. Saltarelli wasn't the choice of any one organization. He was the governor's choice because Pete Wilson felt he was best prepared for

.

the tough job that lies ahead.' " (Bailey & Lait, *Ex-Tustin Official to Join O. C. Board*, L.A. Times (Oct. 12, 1995) p. A1.) The remainder of the article, which was largely favorable of the appointment focused upon: Supervisor Saltarelli's extensive background in public service and business; his willingness to serve out an unexpired term and not to seek election because of his sense of public duty; and reactions by other members of the community to the appointment.[4] Before the foregoing October 12, 1995, article was published, a journalist and counsel for the Los Angeles Times requested certain documents from the Governor. After an exchange of correspondence, on March 1, 1996, the Los Angeles Times filed a mandate petition to compel compliance with the California Public Records Act. (§ 6250 et seq.)

The papers filed in support of the mandate petition illustrate precisely why the documents are subject to the deliberative process privilege. In its points and authorities in support of its request for the completed application forms, counsel for the newspaper wrote: "The public should be entrusted with enough information to allow them *to intelligently evaluate the process that resulted in his selection.*" (Italics added.) At another place in the points and authorities, the newspaper's counsel wrote, "The *Times* is requesting the *basic data that went into the decision-making process.*" (Italics added.) Another stated purpose of disclosure in the same points and authorities was that because of the importance of such an appointment given the fact Orange County was in bankruptcy, the selection was a "key decision of utmost public interest to the" electorate. In the return to our order to show cause, counsel for the Los Angeles Times argued that disclosure was necessitated because of the Governor's "unbridled discretion" in appointing Supervisor Saltarelli and, citing to the opinion in *CBS, Inc.* v. *Block, supra,* 42 Cal.3d at page 655, noted "the degree of subjectivity involved in exercising the discretion cries out for public scrutiny." Finally, at oral argument counsel for the Los Angeles Times admitted with admirable candor that release of the completed application forms would shed light on the *process* which led to the appointment. He argued: "Our request isn't solely based on the expectation that there may have been influence by the Irvine Company. I think that the reporters and the public . . . are curious to know the qualifications of those people who were considered . . . *in order to evaluate the process.*" The entire reason the competed applications considered by Governor Wilson in

---

[4]Also before the respondent court was a letter written by Larry Thomas, a former press secretary for Governor Deukmejian, who was senior vice-president for communications and public affairs of the Irvine Company, directed to a reporter at the Los Angeles Times. Mr. Thomas's letter indicated the article was misleading in that it inferred that the Irvine Company played any significant role in the selection of Supervisor Saltarelli. There is no evidence that any Irvine Company employees did anything else other than set forth in the body of the opinion or engaged in any unlawful or unethical actions. Similarly, there is no evidence of any unethical or illegal conduct by the Governor or his staff.

making the appointment are being sought is to shed light on the deliberative process and such records are privileged. (*Times Mirror Co.* v. *Superior Court, supra,* 53 Cal.3d at p. 1342.) In this respect, I agree with my colleagues and disagree with the respondent court. Hence, it is necessary to weigh the public interest served in not making the documents relied upon by Governor Wilson public with the civic importance which would result from disclosure. (*Id.* at pp. 1344-1346; § 6255.)

### III. THE WEIGHING PROCESS

The Governor relies on *Times Mirror Co.* v. *Superior Court, supra,* 53 Cal.3d at pages 1344-1346 to support the conclusion that the section 6255 weighing process should result in continued nondisclosure of the documents relied upon by him in making the appointment. In *Times Mirror Co.,* the Supreme Court determined that nondisclosure of Governor Deukmejian's "daily, weekly and monthly appointment calendars and schedules" outweighed the public interest in disclosure. (53 Cal.3d at pp. 1329, 1344-1346.) The judicial determination not to order disclosure without an in camera inspection involved over five and one-half years of calendars and schedules. The present case is materially distinguishable from *Times Mirror Co.* The present case involves a narrow request for disclosure of certain documents relied upon by Governor Wilson relating to a single appointment. Unlike the years' worth of papers at issue in *Times Mirror Co.,* the present case involves a constricted request for one set of documents, applications relied upon by Governor Wilson in making a rare gubernatorial decision, the appointment to one seat on the board of supervisors in a single county.

However, even though *Times Mirror Co.* is distinguishable on its facts, that does not answer the question of whether after the weighing process mandated by section 6255 is completed, the appropriate judicial decision is to order disclosure. I am unable to judiciously determine whether the completed questionnaires will reveal anything that furthers the public interest because I have not seen the documents. I am left to speculate whether the public interest in nondisclosure is clearly outweighed by those served by disclosure. Because the respondent court concluded the deliberative process privilege did not apply, it never engaged in the weighing process or conducted any fact-finding. I would remand for the respondent court to examine the completed application forms in camera and engage in the weighing process as suggested by counsel for the Los Angeles Times at the May 23, 1996, hearing.

There are sufficient considerations identified by counsel for the Los Angeles Times which would permit the respondent court to conclude that the

interest in nondisclosure does not clearly outweigh the justification for disclosure. Among the considerations which militate in favor of disclosure are: the Governor appointed a person who had a business relationship with a political supporter; the appointee would normally be subject to public scrutiny because under most circumstances he would have been subjected to the elective rather than the appointive process; the process, which involved the selection of a person for an important position, was largely accomplished in a confidential setting; and the appointment occurred at a unique point in Orange County history, in the midst of the largest municipal bankruptcy in American history. Also weighing in favor of disclosure is the mandate of section 6250 which states: "In enacting this chapter, the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." Moreover, the interests in favor of disclosure may very well be stronger as to Supervisor Saltarelli's application, if he filed one, than as to other persons considered by the Governor. As the Los Angeles Times correctly notes, other jurisdictions have ordered disclosure of applications similar to those relied upon by Governor Wilson in making the appointment in the present case. (E.g., *State ex rel. Plain Dealer* v. *Cleveland* (1996) 75 Ohio St.2d 31 [661 N.E.2d 187, 190-192]; *City of Kenai* v. *Kenai Peninsula Newspapers* (Alaska 1982) 642 P.2d 1316, 1324.) However, it may very well be that some or all of the applications shed no light on the appointive process. Moreover, documents underlying personnel decisions by a Governor may in some circumstances, like hiring decisions in the private sector, warrant complete confidentiality. Some of the applications may contain evidence of an expectation of privacy by the applicant which surely should be weighed by the respondent court. However, in the absence of the applications themselves, I cannot, exercising my independent review responsibilities (*Times Mirror Co.* v. *Superior Court, supra*, 53 Cal.3d at p. 1336; *CBS, Inc.* v. *Block, supra*, 42 Cal.3d at pp. 650-651), judiciously engage in the weighing process mandated by section 6255.

## IV. CONCLUSION

I would remand for the respondent court to engage in the section 6255 weighing process.

On January 21, 1997, the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied March 26, 1997. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.