THE STATE EX REL. DANN *v.* TAFT, GOVERNOR.

[Cite as *State ex rel. Dann v. Taft,*
110 Ohio St.3d 252, 2006-Ohio-3677.]

(No. 2005–1222—Submitted July 18, 2006—Decided July 21, 2006.)

MOYER, C.J.

{¶ 1} Relator, Marc Dann, filed this original action in mandamus seeking a writ ordering respondent Governor Bob Taft to disclose certain weekly reports that allegedly relate to the Bureau of Workers' Compensation ("BWC") and that were prepared by various officials in the executive branch. The parties filed competing discovery motions, presenting the issue whether the governor's claim of executive privilege over those weekly reports is valid.

{¶ 2} The governor urged this court to recognize an absolute privilege, a suggestion all members of this court rejected. *State ex rel. Dann v. Taft,* 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472 ("*Dann v. Taft I*"). By contrast, courts in several states recognized absolute gubernatorial executive privilege as early as the 19th Century as a matter of common law based on principles of separation of powers. See Annotation, Construction and Application, Under State Law, of Doctrine of "Executive Privilege" (1981), 10 A.L.R.4th 355, 357. Absolute privilege is based on the theory that "the coequal status of the legislative, executive, and judicial branches would be disrupted if one branch, the judiciary, were empowered to compel another branch, the executive, to disclose information against its will." Id.

{¶ 3} Some form of executive privilege has long been accorded the executive branch by state courts as a matter of the common law of evidence, including courts in Alabama, Alaska, Arizona, California, Colorado, Maryland, New Jersey, New York, Pennsylvania, Vermont, and Wisconsin. See Annotation, supra, 10 A.L.R.4th 355, Sections 2(b) and 4. See, also, *Nero v. Hyland* (1978), 76 N.J. 213, 386 A.2d 846; *Guy v. Judicial Nominating Comm.* (Del.Super.1995), 659 A.2d 777; *Wilson v. Los Angeles Cty. Super. Court* (1996), 51 Cal.App.4th 1136, 59 Cal.Rptr.2d 537.

{¶ 4} Consistent with this weight of authority, this court recognized not an absolute but a qualified gubernatorial-communications privilege in *Dann v. Taft I,*

109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472. We drew upon the decisions of a number of federal and state courts in crafting a three-step analytical framework for Ohio courts to follow when required to resolve a conflict between a requester of gubernatorial communications and a governor who claims that those communications are privileged. Id. at ¶ 62–72.

{¶ 5} We initiated the process established in *Dann v. Taft I* by issuing an order allowing Governor Taft to formally assert the gubernatorial-communications privilege and authorizing Dann to thereafter submit a statement describing his particularized need to review any weekly reports the governor might assert to be privileged. Id. at ¶ 74.

{¶ 6} Governor Taft timely submitted a sworn affidavit stating that he had provided Dann with all the communications Dann had sought regarding the BWC and asserting the qualified gubernatorial-communications privilege as to other documents. See *State ex rel. Dann v. Taft*, 110 Ohio St.3d 1, 2006-Ohio-2947, 850 N.E.2d 27 ("*Dann v. Taft II*"). Dann thereafter proffered his assertion of particularized need to obtain the documents withheld by the governor.

{¶ 7} In his proffer, Dann stated that he, as an Ohio employer, had contributed to the Ohio Workers' Compensation Fund. Id. at ¶ 11. That assertion arguably could have met the test for particularized need if the governor possessed the records that Dann said the governor possessed. But Dann also claimed that he was "a taxpayer who paid taxes into the general fund used to finance the operations of most of the state departments and agencies reporting to Governor Taft" and had "paid gasoline taxes used to finance the operations of the Ohio Department of Transportation and the State Highway Patrol." He stated that he believed that he had "every reason to be concerned" that a "climate of corruption" had affected state government agencies other than the BWC and that he had made his public records request "[a]s a taxpayer" because he was considering pursuing a taxpayers' action "to enjoin illegal contract or other unauthorized use of public funds and, where appropriate, to recoup the lost funds."

{¶ 8} That basis for asserting particularized need goes far afield of Dann's complaint in mandamus and is not appropriately asserted in this case.[1] Even

---

1. {¶ a} The relator's complaint clearly is focused on the denial of public records *concerning the BWC*, as illustrated by the following statements in that pleading:

{¶ b} "(1) This is an original action for a writ of mandamus * * * compelling the respondent to * * * make available to Relator periodic, routine reports from certain officials in the Bureau of Worker's [sic] Compensation ('BWC'), for the years 1998–2005. * * *

{¶ c} "(2) * * * Senator Dann, on behalf of himself and his constituents, sought to obtain more detailed information regarding the Governor's awareness of the investment practices of the Ohio Bureau of Workers' Compensation ('BWC') and its related entities through public records requests under the Ohio Public Records Act. * * *

assuming that Dann's status as an Ohio taxpayer could serve as a premise for particularized need, it would not be sufficient in this case.

{¶ 9} In order to overcome an assertion of qualified gubernatorial-communications privilege, a requester "must demonstrate particularized, rather than generalized, need and explain why that need outweighs the qualified privilege." *Dann v. Taft I,* 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 67. Dann's status as a taxpayer who paid taxes into the general fund and paid gasoline taxes is shared by nearly all adult Ohio citizens. There is nothing particularized about a need asserted on that basis. Nor would the fact that Dann may be contemplating the filing of a taxpayer suit alleging unspecified misconduct on the part of government officials demonstrate a particularized need, because, in the absence of statutory authority, a taxpayer in his position lacks standing to file a taxpayer suit. *State ex rel. Masterson v. Ohio State Racing Comm.* (1954), 162 Ohio St. 366, 55 O.O. 215, 123 N.E.2d 1. Ohio law does not authorize a private Ohio citizen, acting individually and without official authority, to prosecute government officials suspected of misconduct based on the citizen's status as a taxpayer of general taxes, including the gasoline tax.

{¶ 10} In contrast, longstanding Ohio law does recognize that a taxpayer with a "special interest" in particular public funds has standing to seek equitable relief in a court of equity to remedy a wrong committed by public officers in the management of those funds. Id.; *Racing Guild of Ohio, Local 304, Serv. Emps. Internatl. Union, AFL–CIO v. Ohio State Racing Comm.* (1986), 28 Ohio St.3d 317, 28 OBR 386, 503 N.E.2d 1025. Dann arguably has a "special interest" in the management of the Worker's Compensation Fund because he had paid into that fund as an employer. *Dann v. Taft II,* 110 Ohio St.3d 1, 2006-Ohio-2947, 850 N.E.2d 27, ¶ 16. It is the existence of that arguable special interest in the Workers' Compensation Fund that differentiates Dann's need to access gubernatorial communications concerning that fund from his generalized need to review communications regarding other Ohio executive departments. Dann confined his complaint to seeking communications relating to the BWC, and he has failed to state a credible theory that he has standing to initiate a taxpayer action based on his speculations of misconduct on the part of departments and agencies other than the BWC.

---

{¶ d} "(3) Relator believes access to public records involving communications between BWC officials and the Governor are of great importance * * *.

{¶ e} " * * * *

{¶ f} "(14) As a result of the Respondent's unlawful and arbitrary refusal to provide many of the requested documents (especially most of the communications from BWC Administrator and any of the communications from the BWC Media Relations official), Relator is unable to determine the full extent and timing of Respondent Taft's knowledge of the BWC's investment practices and related losses."

{¶ 11} In his assertion of the gubernatorial-communications privilege, the governor stated that he had "voluntarily waived executive privilege as to any Weekly Reports pertaining to the BWC" and had already provided Dann "all the information he sought related to the BWC." Dann has repeatedly claimed, without supporting affidavits or other evidence, that the governor possesses records relating to the BWC that would implicate the governor in some inappropriate conduct. The governor by sworn affidavit responded that he had provided Dann with all communications regarding the BWC. We ordered the governor to submit the communications under seal to the court for our in camera review in order to resolve the factual issue. *Dann v. Taft II*, 110 Ohio St.3d 1, 2006-Ohio-2947, 850 N.E.2d 27. In this unusual case,[2] resolution of the factual dispute between the parties relating to the contents of the records is potentially dispositive of the cause. If the governor has, in fact, already provided Dann all weekly reports that related to Dann's arguable need for information relative to the BWC, then Dann no longer has any need, either particularized or generalized, for disclosure of additional records.

{¶ 12} The governor complied with the order issued in *Dann v. Taft II* by submitting documents in three categories: (1) unredacted versions of documents previously provided to Dann in redacted format, (2) documents previously withheld from Dann that contain no reference to the BWC, and (3) copies of documents that had been previously provided to Dann in redacted form. The justices of this court have reviewed all of these documents.

{¶ 13} Despite Dann's repeated assertions that the governor withheld from public scrutiny certain documents, our careful review of the voluminous documents submitted by the governor produces two factual conclusions: (1) none of the redactions made by the governor in the weekly reports already provided to Dann relate to the BWC or to any persons doing business with the BWC and (2) none of the other weekly reports withheld from Dann, but submitted to this court, include information relating to the BWC. Our review verifies the governor's statements that the documents submitted to the court for in camera review do not contain any materials concerning the BWC that have not previously been disclosed to Dann. Accordingly we need not proceed beyond the second step of the procedural framework prescribed in *Dann v. Taft I*, because Dann has failed

---

2. In analogous cases in other jurisdictions, it is clear that the governor actually possessed the records sought by the moving party. See, e.g., *Wilson v. Los Angeles Cty. Super. Court* (1996), 51 Cal.App.4th 1136, 59 Cal.Rptr.2d 537 (applications submitted to a governor by persons seeking appointed office); *Doe v. Alaska Super. Court, Third Judicial Dist.* (Alaska 1986), 721 P.2d 617 (letters from private citizens opposing a particular candidate for appointment to a state board); *Hamilton v. Verdow* (1980), 287 Md. 544, 414 A.2d 914 (investigative report compiled in confidence at the request of a governor).

to meet his burden of demonstrating particularized need. However, in this seminal case, disposition of that issue does not fully resolve the matter.

{¶ 14} The complaint in mandamus filed in this case required the court, for the first time, to consider whether Ohio should recognize a gubernatorial executive privilege. Most cases raising issues concerning executive privilege are resolved pursuant to the common law, i.e., no statute or express constitutional provision is implicated. See, e.g., *Herald Assn., Inc. v. Dean* (2002), 174 Vt. 350, 816 A.2d 469. Rather, they are decided pursuant to fundamental principles of American government—the distribution of equal power among the three branches of government. See, e.g., *Office of Governor v. Washington Post Co.* (2000), 360 Md. 520, 759 A.2d 249. It is not uncommon for courts of last resort to be the final arbiters of the fair and appropriate distribution of these powers.

{¶ 15} In *Dann v. Taft II*, we did not prescribe the bounds of the qualified gubernatorial-communications privilege, preferring to do that in the context of the submission of communications for which the governor might assert the privilege. The full contents of the communications, including their possibly sensitive nature, were then unknown to us. It is now in the best interest of this governor, and particularly, future governors and the public, that we more precisely define the scope of that privilege.

{¶ 16} The governor stated as follows in asserting qualified gubernatorial-communications privilege:

{¶ 17} "I want to make clear that I am not asserting the privilege with respect to any documents requested by Senator Dann that contain information pertaining to the Ohio Bureau of Workers' Compensation ('BWC'). In fact, I have waived any privilege related to the hundreds of documents that have already been provided to Senator Dann. * * *

{¶ 18} " * * *

{¶ 19} " * * * These reports and/or redacted material contain information pertaining to other cabinet agencies or other matters unrelated to the BWC.

{¶ 20} " * * *

{¶ 21} " * * * I personally reviewed these reports each week and relied on them to assist me in identifying issues that raised potential policy concerns, required my direct attention or input, or needed further review by my office. In addition, I used these weekly reports (and those from the other Executive Assistants and cabinet directors) as a tool for structuring my internal staff meetings, which are an important part of the process I use to deliberate on issues, formulate policy and make decisions.

{¶ 22} " * * * Based on my review of the Business and Industry Weekly Reports, I conclude that they all meet the criteria for the gubernatorial-

communications privilege because they are communications from the Executive Assistant for Business and Industry that were prepared for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking. None of the Business and Industry Weekly Reports for which I am now asserting the privilege contain information related to the BWC."

{¶ 23} In his memorandum accompanying his affidavit, weekly reports to the governor were described as follows:

{¶ 24} "[T]he Weekly Reports in question contain information relayed confidentially by businesses considering closing or opening an office, plant, or research facility in Ohio, and other confidential information about business expansion plans or state incentive offers. * * * Weekly Reports also contain information about hiring/personnel action such as disciplining an employee or recruiting a potential new hire. * * * Weekly Reports also contain information with respect to the Governor's legislative strategy. * * * Such sensitive and timely information from the Governor's advisors that relays significant events, areas of concern, and other issues warrants the Governor's attention and may require action by the Governor in the form of advice, recommendation, or a decision.

{¶ 25} "The confidentiality of the Weekly Reports allows the Governor to have open and honest communications from his cabinet directors and policy advisors. Weekly Reports aid gubernatorial deliberations, policymaking, and decisionmaking by giving the Governor timely information coupled with the opportunity to reflect upon the information and discuss it with key advisors or obtain additional information or clarification before he has to formulate a response or make a decision."

{¶ 26} These statements imply that the governor deems the full contents of all written weekly reports from executive staff members to be within the scope of the qualified gubernatorial-communications privilege described in *Dann v. Taft I.* That conclusion is not unreasonable in view of the general definition announced in *Dann v. Taft I.* But that interpretation is too broad, and we now define qualified gubernatorial-communications privilege more precisely.

{¶ 27} Initially we note that all the members of this court, including those who dissented in *Dann v. Taft I,* agreed that some form of common-law executive privilege should be accorded Ohio governors. One justice writing separately observed that "[l]ying at the heart of the executive privilege for presidential *or gubernatorial* communications 'is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential *[or gubernatorial]* decisionmaking. A President *[or governor]* and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.' " (Emphasis added.) *Dann v. Taft I,* 109 Ohio St.3d 364, 2006-

Ohio-1825, 848 N.E.2d 472, ¶ 76 (Resnick, J., dissenting), quoting *United States v. Nixon* (1974), 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ 28} The second dissenting justice wrote: "Certainly, the governor is entitled to privacy in the making of decisions, and, to that end, the common law recognizes the 'deliberative process' privilege. The deliberative-process privilege 'allows the government to withhold documents and other materials that would reveal "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." ' *In re Sealed Case* (C.A.D.C.1997), 121 F.3d 729, 737, quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena* (D.D.C.1966), 40 F.R.D. 318, 324. The aim of the privilege is to encourage unrestrained debate in the formulation of policy, but to keep public purely factual information." 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, at ¶ 89 (Pfeifer, J., dissenting).

{¶ 29} The differences reflected in the several opinions in *Dann v. Taft I* were not differences regarding the propriety of recognizing an executive privilege for a governor, a privilege widely recognized throughout the country. Rather, the opinions reflect different views as to the procedural burdens to be placed on the competing parties when a governor has been the subject of a public-records request but refuses to comply. The majority accorded the governor a presumption that his invocation of gubernatorial-communications privilege was appropriate in the absence of a demonstration by a requester of particularized need to review the documents. Those who dissented believed that an Ohio governor should not benefit from such a presumption.

{¶ 30} Many courts have recognized that the scope of a governor's executive privilege overlaps the more general deliberative-process privilege in significant ways. The differences between the gubernatorial-communications privilege we recognized in *Dann v. Taft I* and the deliberative-process privilege primarily concern the underpinnings of the two privileges and the identity of individuals entitled to assert them. As we observed in *Dann v. Taft I*, the gubernatorial-communications privilege is grounded on the constitutional principle of separation of powers, while the deliberative-process privilege is grounded in the common law of evidence. Id. at ¶ 43. The deliberative-process privilege is actually broader in one sense than the gubernatorial-communications privilege because it may be asserted by various executive officials, while only a governor may assert the gubernatorial-communications privilege. Id. at ¶ 42.

{¶ 31} It is clear from *Dann v. Taft I* that it is initially the governor's decision to assert gubernatorial-communications privilege when gubernatorial documents are requested by a member of the public. However, we also stated in *Dann v. Taft I*: "The gubernatorial-communications privilege protects the public by allowing the state's chief executive the freedom that is required *to make*

*decisions.*" (Emphasis added.) 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 56. We recognized that the privilege advances the public's interest in sound *executive decisionmaking.* Id., citing *United States v. Nixon,* 418 U.S. at 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039. In addition we cautioned that executive privilege "should not be lightly invoked." Id. at ¶ 70.

{¶ 32} Our recognition of a qualified gubernatorial-communications privilege did not equate to a judicial stamp of imprimatur on blanket secrecy of all written communications to or from the governor. Nothing in *Dann v. Taft I* warrants the conclusion that a governor may invoke the privilege to exempt from the Public Records Act purely informational public records not associated with a specific issue requiring contemporaneous decisionmaking of the governor.

{¶ 33} The fact that a public record possessed by a governor has some privileged content does not justify a governor in withholding the nonprivileged portions of the public record from a Public Records Act requester. Our review of the weekly reports provided to us by the governor for in camera review prompts us to clarify that many written communications to and from the governor simply do not concern "sensitive decisional and consultative responsibilities of the Governor" [3] and have little if anything to do with gubernatorial policymaking or decisionmaking except in the most general way. To be considered "made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking," and thus subject to the exemption created by the General Assembly for "records the release of which is prohibited by state or federal law," R.C. 149.43(A)(1)(v), communications must rise above the merely informational and must possess some attribute of being "advisory, investigatory, decisional, consultative, deliberative, or sensitive" in nature. Cf. *Dann v. Taft I,* 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, at ¶ 81 (Resnick, J., dissenting). Purely informational communications that serve as status reports for the governor relating to the activities of a subordinate or an executive department do not fall within the scope of the gubernatorial-communications privilege and are thus not exempt from the Public Records Act.

{¶ 34} It follows that many written communications to the governor remain subject to disclosure pursuant to the Public Records Act, R.C. 149.43. The governor is not generally exempt from the purview of the Public Records Act simply because he or she possesses a qualified privilege to withhold from the public communications integral to gubernatorial deliberations, policymaking, and decisionmaking. When in doubt whether information requested falls within the scope of the privilege, the governor should disclose it.

---

3. *Nero v. Hyland* (1978), 76 N.J. 213, 225–226, 386 A.2d 846.

{¶ 35} In order to be protected by the qualified privilege, the communication must relate directly to a specific decision required of or sought from the governor. It must be used by the governor in the process of arriving at a decision. An example of such a circumstance would be the following: Two bills introduced in the General Assembly relate to the distribution of electricity by companies regulated by the Public Utilities Commission of Ohio. One bill would be economically attractive to individual consumers of electricity, and the other bill would offer incentives to industrial users of electricity. The governor has been requested to state his or her support or opposition to each of the bills, which arguably benefit different groups of consumers. Written communications are submitted to the governor arguing for and against his support of the legislation.

{¶ 36} Those communications would be privileged because they would be used to assist the governor in making a decision with respect to a specific issue. A memo to the governor regarding only the status of the legislation, i.e., one that requires the governor to make no decision, would not be privileged.

{¶ 37} We recognize that a governor could argue that every piece of information, every communication, virtually every conversation, collectively inform a governor, building the governor's reservoir of useful knowledge available to every gubernatorial decision. Such an application of gubernatorial privilege is overbroad. Also outside the bounds of the privilege are observations in communications to the governor that merely reflect unfavorably upon an individual or an entity.

{¶ 38} There is another category of topics that find their way into communications to a governor that, while not protected by a gubernatorial privilege, may be shielded from public access by legislation or other principles of law. Such topics include communications regarding trade secrets or the security of an individual, a building, or a community.[4]

{¶ 39} Our review of the weekly reports submitted to the governor in this case causes us to conclude that most of the communications are status reports, information regarding upcoming events, reports regarding plans of various companies relating to their business where a decision by the company is probably now public, and miscellaneous reports on topical current events. Documents of that nature are not covered by the qualified executive privilege and are therefore subject to disclosure pursuant to R.C. 149.43.

{¶ 40} Another category of the communications submitted by the governor for our review is composed of reports that, at the time the report was given to the governor, provided information regarding economic or business decisions of

4. It would be appropriate for the General Assembly to consider adopting legislation that could define these and other topics.

companies. Such reports arguably should be confidential until a public announcement is made by the company. It is not possible for us to determine from the records submitted by the governor whether such memoranda, most of which were prepared in 2003, should continue to be confidential. In most instances, the time within which a company would have announced or implemented a decision has probably passed, but this court should not presumptively make that decision.

{¶ 41} We conclude that most, if not all, of the communications submitted by the governor are not protected by the qualified executive privilege and are therefore subject to R.C. 149.43. If an appropriate public record request is made, those communications would not be shielded.

{¶ 42} We deny Dann's request for a writ of mandamus, however, since all weekly reports relating to the BWC have previously been provided to him by the governor.

Writ denied.

LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

RESNICK and PFEIFER, JJ., concur in part and dissent in part.

———————

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

{¶ 43} For the past year, the governor has been claiming that the executive decisionmaking process would virtually collapse if the weekly reports at issue were to be released to the public. He has requested and received from this court a protective privilege that is rarely afforded to presidents. Yet in the final analysis, these records have proved to be so innocuous, mundane, and unrelated to the decisional process that the five members of the majority who originally graced the governor with a presumptive privilege have been compelled to find them unworthy of protection even though the relator has purportedly failed to meet the majority's requirement of particularized need.

{¶ 44} The governor has seriously misrepresented the nature and import of the information contained within the disputed weekly reports in his efforts to secure an executive privilege in this case, and he should bear the inevitable consequences. The governor should not be saved by the majority's mysterious decision to deny the writ while rejecting the governor's attempt to invoke the privilege.

{¶ 45} In rejecting the governor's claim of privilege as to the records submitted under seal, the majority concludes that "most, if not all, of the communications submitted by the governor are not protected by the qualified executive privilege and are therefore subject to R.C. 149.43." See ¶ 41. Quoting from my dissent in *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472,

at ¶ 8 (*"Dann v. Taft I "*), the majority now clarifies that to fall within the scope of the gubernatorial-communications privilege, "communications must rise above the merely informational, and must possess some attribute of being 'advisory, investigatory, decisional, consultative, deliberative, or sensitive' in nature." See ¶ 33. I concur in this aspect of the majority's decision.

{¶ 46} In denying the writ, however, the majority places the proverbial cart before the horse by requiring the relator to show a particularized need for documents that are not covered by the privilege in the first place. The governor has waived any privilege with respect to communications pertaining to the Bureau of Workers' Compensation ("BWC"), and the majority has found that the withheld documents "are not covered by the qualified executive privilege and are therefore subject to disclosure pursuant to R.C. 149.43." See ¶ 39. Why, then, should Dann be required to show a particularized need for any of the records? It makes no sense to impose a requirement that arises only by virtue of a privilege that is not applicable.

{¶ 47} According to the majority, "Dann confined his complaint to seeking communications relating to the BWC." See ¶ 10. Thus, the majority denies Dann's request for a writ of mandamus because "all weekly reports relating to the BWC have previously been provided to him by the governor." See ¶ 42.

{¶ 48} I cannot agree with the majority's finding that Dann's requests have been limited to information concerning the BWC. While Dann's original complaint was primarily directed at obtaining BWC-related records, it also alleged that "[o]n June 16, 2005, the Relator made three additional written requests pursuant to the Ohio Public Records Act. The first request sought weekly memoranda and other periodic reports from James Samuel (Governor's liaison to the BWC) and/or his predecessors to the Office of the Governor for the years 1998–2005." In a related affidavit, which was filed with the court nine months before it decided *Dann v. Taft I,* Dann specifically stated, "Although the BWC scandals motivated my request, I wanted the weekly reports for all information they contained concerning state government operations whether or not they involved the BWC."

{¶ 49} Moreover, if Dann's requests were actually limited to records pertaining to the BWC, there would have been no controversy for the court to decide in the first instance. Long before the court decided the issue of privilege in *Dann v. Taft I,* the governor had waived the assertion of any privilege over weekly reports or portions thereof concerning the BWC. There was simply no need to determine in *Dann v. Taft I* whether a privilege attaches to those records, since the governor was no longer asserting a privilege over them. But the court did decide the issue of privilege with respect to something that was in dispute, and that something was the only weekly reports for which the governor continued to

seek protection under the executive privilege, i.e., the weekly reports from Samuel that do not contain information relating to the BWC.

{¶ 50} Accordingly, I concur in the majority's decision to the extent that it finds the gubernatorial-communications privilege inapplicable to the withheld reports, but dissent from its decision to deny the writ of mandamus and require Dann to reassert his request for the Samuel reports. It is pointless to insist that Dann must take still more action under R.C. 149.43 to obtain disclosure of these documents. The governor should not be afforded any further opportunity to delay the release of these public records.

---

PFEIFER, J., concurring in part and dissenting in part.

{¶ 51} Our in camera review of the records the governor sought to withhold reveals a collection of information so inane, so inconsequential, and so insignificant that taken together it could not generate one interesting newspaper story. But it has generated still another opinion by this court.

{¶ 52} I do not choose to reargue or reinterpret *Taft I*. As for the question arising today, we can all agree that the reports at issue are public records and that the governor may exert no privilege to prevent their disclosure. I depart from the majority's determination to deny a writ of mandamus. Relator has asked for all the records that this court determines today to be public. For instance, in his public records request of June 16, 2005, relator requested from the governor "[a]ll weekly memoranda, weekly reports, or other periodic reports required by statute or office procedure or practice from James Samuel and James Samuel's predecessor(s) to the Governor from the years 1998–2005." That same request became the basis for part of relator's complaint in mandamus. At paragraph ten of his complaint, relator states:

{¶ 53} "(10) On June 16, 2005, the Relator made three additional written requests pursuant to the Ohio Public Records Act. The first request sought weekly memoranda and other periodic reports from James Samuel (Governor's liaison to the BWC) and/or his predecessors to the Office of the Governor for the years 1998–2005."

{¶ 54} Relator asserted in his complaint for mandamus that the governor failed to provide the requested records and sought a writ of mandamus to force their disclosure. Relator did not limit his public records request or his complaint in mandamus to Samuel's memoranda specifically relating to the BWC. He asked for all of the reports. The governor released to relator only reports relating to the BWC. But that was not an act of largesse by the governor; it was a failure to

respond completely to the relator's legitimate public records request. No matter what the relator's particular area of interest was, he asked for *all* of the Samuel memoranda.

{¶ 55} If the majority is right that relator sought only records specifically relating to the BWC, then much of this court's time and many trees have been needlessly sacrificed. Could it be true that all of this litigation was over a bunch of records that no one ever asked for? If so, this matter could have been solved well short of this court's creation of a gubernatorial-communications privilege. The governor need merely have said, "I gave relator everything he asked for." What the governor really did was to claim that everything was privileged, but released the records he deemed relevant to the relator's interest. The balance of what relator sought has been the focus of this matter. Today we hold that all of those records are public.

{¶ 56} Accordingly, since the relator had a right to see everything he sought, I would grant the writ of mandamus. Further, I would award attorney fees to the relator, since he meets this court's two-pronged test for such an award. First, the public has an unquestioned interest in the competent and ethical administration of the state's workers' compensation system, and so relator has established a public benefit. Second, the respondent has failed to comply with this legitimate records request for invalid reasons. *State ex rel. Toledo Blade Co. v. Ohio Bur. of Workers' Comp.*, 106 Ohio St.3d 113, 2005-Ohio-6549, 832 N.E.2d 711, ¶ 24.

---

Gittes & Schulte, Frederick M. Gittes, and Kathaleen B. Schulte, for relator.

Jim Petro, Attorney General, and Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, and Bryan R. Faller, for respondent.