Filed 7/13/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRANDON RITTIMAN et al., <br><br> Petitioners, <br><br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent. | A162842 <br><br> (Public Utilities Commission Nos. 20597, 20598, 20599 & 20600) <br> ORDER MODIFYING OPINION AND DENYING REHEAR-ING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 17, 2022, be modified as follows:

1. On page 16 modify footnote 11 to read as follows:

In some specified instances, an application for rehearing must be filed within 10 days of issuance of the challenged order or decision. (Pub. Util. Code, § 1731, subds. (b)(1), (c), (d).) However, the CPUC seems to agree that the 30-day, rather than the 10-day, period would

apply to seeking rehearing of a CPUC resolution affirming the denial of a PRA request.

2. On page 16, delete paragraph beginning with "The commission then has up to 60 days to either grant or deny an application for rehearing" and replace with:

The commission then has up to 60 days to either grant or deny an application for rehearing. (Pub. Util. Code, § 1733, subds. (a) & (b).) If the commission does not grant or deny an application within 60 days, the party seeking rehearing may consider the application denied and seek judicial review. (*Ibid.*) Whether or not the challenged order or decision is suspended during this time depends on when the application for rehearing is filed and how quickly the commission acts on the application.[12] (*Ibid.*)

---

[12] Public Utilities Code section 1733 provides:

"(a) Any application for a rehearing made 10 days or more before the effective date of the order as to which rehearing is sought, shall be either granted or denied before the effective date, or the order shall stand suspended until the application is granted or denied; but, absent further order of the commission, the order shall not stand so suspended for more than 60 days after the date of filing of the application, at which time the suspension shall lapse, the order shall become effective, and the application may be taken by the party making it to be denied.

"(b) Any application for a rehearing made within less than 10 days before the effective date of the order as to which rehearing is sought, and not granted for 60 days, may be taken by the party making the application to be denied, unless the effective date of the order is extended for the period of the pendency of the application." (Pub. Util. Code, § 1733, subd. (a), (b).)

3. On page 16, delete paragraph beginning with "Thus, the statutory times specified by the rehearing statutes—which, not even accounting for any rehearing, itself, total at a minimum at least 70 days…" and replace with the following paragraphs:

If the commission grants the application without "a suspension of the order involved, the commission shall forthwith proceed to hear the matter with all dispatch and shall determine the matter within 20 days after final submission" on rehearing.[13] (Pub. Util. Code, § 1734.) Otherwise, there is no timeframe for rehearing and final determination.[14]

Thus, just the application-for-rehearing process for a resolution affirming the denial of a PRA request, itself, can take 90 days (30 days to file an application and 60 days for the commission to act). And if the commission grants the application, there is no time frame for the rehearing and disposition process.[15] These extended time periods

[13] If the commission does not decide the matter within 20-days of submission, the party that sought rehearing may treat the decision as having been affirmed. (Pub. Util. Code, § 1734.)

[14] In its petition for rehearing, the CPUC states that, in practice, the 20-day period never applies because "when a rehearing is granted, the relevant holding is always vacated," acknowledging "there is generally no defined timeframe for the [c]ommission to conduct a rehearing."

[15] In its petition for rehearing, the commission asserts any rehearing of a resolution affirming the denial of a PRA request would entail nothing more than correcting any identified legal errors in the resolution, which it assures us would not result in any "indefinite delay." While this may be the CPUC's aspirational goal, there is no assurance that will be the case, as the instant proceeding demonstrates. Moreover, the salient point is that the statutes

3

cannot be squared with the procedural provisions of the PRA mandating that agencies respond to requests within a much tighter timeframe.

4. In inserting footnotes on page 16 (footnotes 12, 13, 14 & 15), the subsequent footnote numbering shall be modified to the correct sequencing.

Dated:

_____

Humes, P. J.

---

that control the rehearing process impose *no* time frame for the rehearing of, and final action on, a resolution affirming the denial of a PRA request.

Filed 6/17/22 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRANDON RITTIMAN et al., <br><br> Petitioners, <br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent. | A162842 <br><br> (Public Utilities Commission Nos. 20597, 20598, 20599 & 20600) |

This original mandamus proceeding brought under the Public Records Act (PRA) (Gov. Code, §§ 6251 et seq.) presents three questions: (1) Was petitioner[2] required to fully exhaust the administrative remedies set forth in the Public Utilities Code and in California Public Utilities Commission (CPUC) General Order 66-D in order to judicially challenge the commission's denial of his PRA requests? (2) Has the CPUC's action on petitioner's administrative appeal rendered this writ proceeding moot? (3) Did the commission properly deny petitioner's PRA requests on the basis of the "Governor's correspondence" exemption (Gov. Code, § 6254 subd. (l)) and/or the "deliberative process" privilege (*id.*, §§ 6254 subd. (k), 6255, subd. (a))? We conclude the answer to the first two questions is "no," and the answer to

_____

[2] Although there are two named petitioners, Brandon Rittiman and Tegna, Inc., we use the singular since Rittiman made the PRA requests at issue and for ease of reference.

1

the third, is "yes."  We therefore sustain the CPUC's return by way of demurrer without leave to amend and dismiss this original proceeding.

## I.  BACKGROUND

In mid-November 2020, petitioner made four PRA requests seeking "all communications between" CPUC President Marybel Batjer and/or her "principal executive staff," and members of the Governor's staff, since the date of Batjer's appointment in mid-August 2019.  The requested records included "all documents, emails, or texts whether made on state-issued or personal devices."

Consistent with Government Code section 6253, subdivision (c),[3] the CPUC, on November 30, notified petitioner of its "determination" that the requested records were statutorily exempt from disclosure under Government Code section 6254, subdivision (l)—the Governor's correspondence exemption[4]—and would not be made available.

On December 4, in accordance with CPUC General Order 66-D, enacted pursuant to Government Code section 6253.4, subdivisions (a) and (b)(28),[5]

---

[3]  Government Code section 6253, subdivision (c), provides in pertinent part: "Each agency, upon a request for a copy of records, shall, within 10 days from the receipt of the request, determine whether the request, in whole or in part, seeks copies of disclosable public records in the possession of the agency and shall promptly notify the person making the request of the determination and the reasons therefore."

[4]  Government Code section 6254 excludes from disclosure "any of the following records: [¶] . . . [¶]  (l) "Correspondence of and to the Governor or employees of the Governor's office or in the custody of or maintained by the Governor's Legal Affairs Secretary."  (Gov. Code, § 6254, subd. (l).)

[5]  Government Code section 6253.4, subdivision (a) states:  "Every agency may adopt regulations stating the procedures to be followed when making its records available in accordance with this section."  Subdivision (b)(28) sets forth a list of government entities, including the CPUC, that must also "establish written guidelines for accessibility of records," which must be

2

petitioner sent an e-mail to a CPUC Legal Division attorney appealing the determination that the requested records are statutorily exempt from disclosure. His stated ground for appeal was that "correspondence," as the term is used in the exemption, must be "narrowly . . . 'confined to communications by letter,' " citing *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1337 (*Times Mirror Co.*). (Underscoring omitted.) He therefore requested that the commission provide "all text messages, emails, and calendar entries." Although petitioner's e-mail did not comply with the commission's procedural rules for such appeals, the commission acknowledged receipt of his appeal.

The next step in the CPUC's internal appeal process requires its legal division to prepare a draft "Resolution" responding to the issue(s) raised by the requestor's appeal. (Gen. Ord. 66-D § 6.1.) As the resolution subsequently adopted by the commission in this case illustrates, such resolutions are in the nature of a detailed legal disposition that summarizes the facts of the particular PRA request and discusses and applies what the CPUC determines is the applicable law. Draft resolutions are made available for public review and comment, and acted on by the commission at the next scheduled board meeting. (Gen. Ord. 66-D § 6.1.) General Order 66-D does not set forth deadlines for completing and posting of draft resolutions, or for commission action on a draft resolution.

As of mid-April 2021, the CPUC had not posted a draft resolution on petitioner's appeal, and petitioner notified the commission by letter that if a draft was not before it on April 22, he would deem its lack of action "a

posted and copies of which must be available on request. (*Id*., § 6253.4, subd. (b)(28).)

3

constructive denial" of his appeal "and seek judicial review" in the appellate courts.

In his letter, petitioner advanced a new reason why the Governor's correspondence exemption assertedly did not apply. He maintained a "California's Court of Appeals has held that [Government Code] section 6254(l) provides confidentiality to a small subset of 'letters' and other correspondence received by the Governor's Office: it applies only to those communications sent from individuals, companies, and/or groups who are *outside of the government*," citing to *California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 168 (*First Amendment Coalition*).

A CPUC attorney responded by letter five days later, apologizing for the delay in the draft resolution, citing "workload issues." She anticipated the draft resolution would be prepared and posted on May 21, for action at the commission's June 24 board meeting.

Not seeing a draft resolution on May 21, petitioner e-mailed the same CPUC attorney on May 24 and 25. The attorney again apologized and stated the draft would be circulated by July 2 for the commission's August 4 board meeting.

Two weeks later, on June 14, petitioner filed the instant mandamus proceeding. He alleged, given the passage of seven months since the filing of his administrative appeal, his appeal had been "constructively denied." He further maintained the Governor's correspondence exemption applies solely to correspondence from private parties and therefore is inapplicable to his requests for communications between the Commission President and/or her principle executive staff, and the Governor's staff. He requested immediate access to the disputed records.

4

We summarily denied the petition, indicating petitioner had not exhausted his administrative remedies. The Supreme Court granted review and transferred the matter back to us with directions to vacate our denial order and issue an order to show cause (OSC) to the trial court. The high court corrected its order on November 22, directing that we issue an OSC to the CPUC. We did so on December 1.

In the meantime, on November 18, the commission adopted Resolution No. L-612, an 11-page, single-spaced decision, denying petitioner's administrative appeal, principally on the basis of the Governor's correspondence exemption (Gov. Code, § 6254, subd. (l)), and "deliberative process" privilege (*id.*, §§ 6254, subd. (k), 6255[6]).

On November 30, petitioner sent an e-mail to several CPUC e-mail addresses, including that of the person (a legal support supervisor II) who had served him by e-mail him with a copy of the CPUC's Resolution, attaching an "Application for Rehearing." Petitioner sent a follow up e-mail asking for confirmation that his prior e-mail had been received, to which the same person responded, "Confirm receipt."[7] This apparent filing effort was not done in accordance with CPUC procedural rules, which require either filing a hard copy with the CPUC docket office or use of a specific e-filing service, which, upon filing, provides the party with confirmation of filing and

---

[6] "The deliberative process privilege (known as 'executive privilege' under federal law) protects materials reflecting deliberative or decisionmaking processes." (*Wilson v. Superior Court* (1996) 51 Cal.App.4th 1136, 1142; see generally *Times Mirror Co., supra,* 53 Cal.3d at pp. 1339–1346.)

[7] We grant petitioner's request for judicial notice filed January 14, 2022, of his e-mail (exhibit 5) and the staff person's reply (exhibit 6). The request is otherwise denied.

docketing. (Cal. Code Regs., tit 20, § 1.13.) Petitioner's e-mail never made its way to the docketing office, and apparently petitioner never followed up to confirm timely filing and docketing.

The CPUC duly filed a return to the OSC in the form of a demurrer, supported by a memorandum of points and authorities. The commission advanced three grounds for dismissal of the writ petition: (1) Petitioner failed to fully exhaust his administrative remedies, specifically by failing to file an application for rehearing as required by Public Utilities Code section 1731 and General Order 66-D section 6.2. (2) The CPUC's adoption of Resolution No. L-612 denying petitioner's administrative appeal moots this mandamus proceeding. (3) The commission properly denied petitioner's PRA requests on the basis of the Governor's correspondence exemption and the deliberative process privilege.

Petitioner filed a reply, taking issue with each of these grounds.

## II. DISCUSSION

### A. Exhaustion of Administrative Remedies

We first address the CPUC's claim that since petitioner failed to exhaust his administrative remedies set forth in the Public Utilities Code, and specifically the rehearing provisions of Public Utilities Code section 1731, we lack jurisdiction to consider the merits of petitioner's challenge to the denial of his PRA requests and must dismiss his writ petition. Petitioner maintains, having granted review and transferred the matter to this court, the Supreme Court has already ruled in his favor on exhaustion and therefore the issue need not detain us further. He further claims that even if exhaustion may otherwise be required, he is excused from doing so in this case given the commission's delay in acting on his administrative appeal. As we shall explain, we conclude the administrative remedies set forth in the

6

Public Utilities Code, and specifically section 1731, do not apply to the PRA and therefore there is no jurisdictional impediment to our review of petitioner's challenge to the commission's determination denying his requests. We further conclude any non-statutory administrative remedies must comply with the language and purpose of the PRA and, in this case, petitioner is excused from exhausting such remedies.

Before taking up the CPUC's exhaustion argument, we address petitioner's assertion that the issue has already been decided in his favor because the Supreme Court granted review and transferred the matter back to us with directions to issue an OSC. According to petitioner, "[t]he fact that the Supreme Court issued the Writ proves, beyond peradventure, that it necessarily rejected CPUC's argument that *no court* has jurisdiction over this case until Petitioners 'have exhausted their administrative remedies.'"

Petitioner is mistaken as to the import of a grant of review by our high court. In granting a petition for review, the court decides only to accept the case and to address one or more of the issues tendered for review—this is *not* a decision on the merits of any issue as to which the court grants review. (See Cal. Rules of Court, rule 8.500(b), (c).) Rather, on granting review, the court may retain the case on its own docket (for further briefing, oral argument and decision) or transfer the case back to the Court of Appeal from which it originated, with directions, for example, in writ proceedings, to issue an OSC to the lower tribunal (most often the trial court, but in some cases, as here, another tribunal). (See Cal. Rules of Court, rules 8.516(a) & (b), 8.528(d).) The grant and transfer procedure is commonly used, and it is *not* a merits decision. (See *id.*, rule 8.528(d) & (f).)

Nor was the high court's directive to issue an OSC any kind of merits determination. (See Cal. Rules of Court, rule, 8.528(d) & (f); see also

*Clemmons v. Railroad Commission* (1916) 173 Cal. 254, 256–258 (*Clemmons*) [that high court issued OSC in writ of review proceeding did not foreclose commission from claiming petitioners' failure to file a timely application for rehearing deprived court of jurisdiction to decide the merits].) On the contrary, issuance of an OSC in a mandamus proceeding makes the matter a "cause," requiring the filing of a return and allowing for the filing of a reply, requiring oral argument unless waived, and requiring disposition by way of a written decision. (See Cal. Rules of Court, rule 8.487(b); *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1239–1241.)

Thus, whether petitioner was, as the CPUC asserts, required to fully exhaust the administrative remedies set forth in the Public Utilities Code and General Order 66-D is squarely before us.

In support of its assertion that petitioner was required to fully exhaust the administrative remedies set forth in the Public Utilities Code, and specifically section 1731, the commission cites to the constitutional and statutory provisions investing it with broad administrative, legislative and judicial powers, and defining the bounds of judicial review of commission actions. (See generally *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630; see also *Clemmons, supra,* 173 Cal. at pp. 256–258 [requiring full exhaustion]; *PegaStaff v. Public Utilities Com.* (2015) 236 Cal.App.4th 374, 388–389 (*PegaStaff*) [requiring full exhaustion].)

These provisions include article XII, section 2, of our constitution which grants the CPUC the right to "establish its own procedures" "[s]ubject to statute and due process." (Cal. Const., art. XII, § 2.) Section 5 of article XII, in turn, grants the Legislature "plenary power, unlimited by other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission, [and] to establish the

8

manner and scope of review of commission action in a court of record. . . ." (*Id.,* § 5.)  Pursuant to this power, the Legislature has enacted a host of statutes governing procedure in, and judicial review of, matters before the commission.  (Pub. Util. Code, §§ 1701 et seq., 1731 et seq; *PegaStaff, supra,* 236 Cal.App.4th at pp. 381, 383.)  These statutory provisions include Public Utilities Code section 1701, which states in pertinent part: "All hearings, investigations, and proceedings shall be governed by this part and by rules of practice and procedure adopted by the commission. . . ."  (Pub. Util. Code, § 1701, subd. (a).)  Pursuant to this statutory authority, as well as its own constitutional authority, the CPUC has enacted, by regulation, decision and general order (such as General Order 66-D), numerous rules of practice and procedure. (E.g., Cal. Code Regs., tit. 20, § 1.3 et seq.; Gen. Ord. 66-D.)

We are specifically concerned here with Public Utilities Code section 1731, entitled "Judicial review procedures," which states in pertinent part: "After an order or decision has been made by the commission, a party to the action or proceeding . . . may apply for a rehearing. . . . *A cause of action arising out of any order or decision of the commission shall not accrue in any court to any corporation or person unless the corporation or person has filed an application to the commission for a rehearing* within 30 days after the date of issuance. . . ."  (Pub. Util. Code, § 1731, subd. (b)(1), italics added.)  Public Utilities Code section 1759, in turn, entitled "Jurisdiction," states in pertinent part: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to . . . enjoin, restrain, or interfere with the commission in the performance of its official duties."  (*Id.,* § 1759, subd. (a).)  Such judicial action is typically by way of writ of review.  (*Id.,* § 1756, subd. (a).)  However, "[t]he writ of

mandamus shall [also] lie from the Supreme Court and from the court of appeal to the commission in all proper cases as prescribed in Section 1085 of the Code of Civil Procedure." (*Id*., § 1759, subd. (b).)

Our Supreme Court has twice held that these constitutional and statutory provisions are of true jurisdictional import. In *Clemmons*, the court had before it a challenge to a water rate increase approved by the then-denominated Railroad Commission. (*Clemmons, supra,* 173 Cal. at p. 255.) The commission maintained the court could not consider the petitioners' challenge "because timely application had not been made to the commission itself for rehearing." (*Id.* at p. 256.) Although the petitioners had filed an application, they had not done so within the prescribed time period. (*Id.* at pp. 257–258.)

The high court first explained that its grant of an OSC to the commission did not preclude it from "continuing to insist" that the court could not reach the merits of the rate challenge—because "the point goes to the jurisdiction of the court and it may, therefore, be raised at any stage of the proceedings." (*Clemmons, supra,* 173 Cal. at p. 256.)

The court went on to agree with the commission that it could not address the merits, citing to the statutory language (now set forth in Pub. Util. Code, § 1731) that " '[n]o cause of action arising out of any order or decision . . . shall accrue in any court" in the absence of an application for rehearing by the commission. (*Clemmons, supra,* 173 Cal. at p. 257.) This conclusion, said the court, was "the necessary consequence" of the constitutional grant of authority to the legislature "to confer powers upon" the commission and of the legislature's chosen means of doing so. (*Id.* at pp. 256–257.) Since the petitioners had failed to timely file an application for rehearing, "it follow[ed] that the petitioners [had] lost their right to apply to

10

this court, or to any court in the state, for a review of the action of the commission."[8] (*Clemmons*, at p. 257.)

Although *Clemmons* was decided more than a century ago, the Supreme Court has never stepped back from its decision in that case. In *Consumers Lobby Against Monopolies v. Public Utilities Commission* (1979) 25 Cal.3d 891, 902 (*Consumers Lobby*),[9] the court reiterated it is "required to deny [an] entire petition [for writ of review] on procedural [i.e., non-merit] grounds if certain prerequisites to our jurisdiction are not met," for example, "if prior to filing in this court the petitioner failed to apply to the commission for a rehearing." We, of course, are bound to follow Supreme Court precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456.)

In light of *Clemmons* and its progeny, and in light of the continuing statutory constraints imposed by the Legislature on judicial challenges to actions of the CPUC, the commission's insistence that petitioner was jurisdictionally required to fully exhaust his administrative remedies, and specifically, was required to file a timely application for rehearing under Public Utilities Code section 1731, is understandable.[10] (See *Shiseido*

---

[8] The CPUC continues to require strict compliance with its rules governing the filing of applications for rehearing. (E.g., *In re The Matter of the Application of San Diego Gas & Electric Company* (Cal. P.U.C., Dec. 18, 2014) 2014 WL 7437560 [denying motion to accept late filing of application for rehearing that was partially, but not fully, electronically transmitted to the Docket Office by 5:00 p.m.].)

[9] Disapproved on another ground in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896.

[10] We recognize that in many other contexts, the courts, including our Supreme Court, have held exhausting administrative remedies does not go to a court's fundamental jurisdiction and therefore failure to exhaust such remedies can be waived if the defense is not timely raised. (See e.g., *Kim v.*

11

*Cosmetics (America) Ltd. v. Franchise Tax Bd.* (1991) 235 Cal.App.3d 478, 487–489 [statutory requirement that claim for refund be filed, enacted pursuant to Legislature's constitutionally authorized power to enact refund procedures, was mandatory and could not be excused under any exception to the exhaustion doctrine].)

However, the court in *Clemmons* was not confronted with a second, later-enacted statutory scheme that by its plain terms is also applicable to the CPUC. (Gov. Code, § 6253.4, subd. (b)(28); see *Public Utilities Com. v. Superior Court* (2016) 2 Cal.App.5th 1260, 1267 ["It is undisputed that the PRA applies to the CPUC."].) The task before us, then, is squaring the apparently fundamental jurisdictional constraints on judicial review set forth in the Public Utilities Code, with the provisions of the PRA directing government entities, including the CPUC, to act with all due haste in handling PRA requests (Gov. Code, §§ 6253, subds. (c) & (d), 6253.4, subd. (c)) and directing courts to do the same in resolving disputes over public records (*id.,* § 6258).

These two statutory schemes can be harmonized by focusing on the constitutional authority granted to the Legislature and the CPUC. As we have recited, the Legislature has been constitutionally bestowed with "plenary power" to "confer additional authority and jurisdiction upon the

---

*Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336, 1347–1348; *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 220–223 (*Green*).) However, as *Clemmons* and *Consumers Lobby* reflect, the Supreme Court has taken a different view as to the statutory administrative remedies set forth in the Public Utilities Code. (See also *Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1246–1253 [exhaustion of federal statutory administrative remedies is a fundamental jurisdictional prerequisite to pursuing claims against the Federal Deposit Insurance Corporation].)

12

commission" and "to establish the manner and scope of review of commission action in a court of record." (Cal. Const., art. XII, § 5.) While the CPUC has also been granted the constitutional power to "establish its own procedures," this authority is "[s]ubject to statute and due process." (*Id.*, § 2.) Given that the Legislature has expressly made the PRA applicable to the CPUC, we conclude the PRA represents an exercise of the Legislature's "plenary power" over the CPUC, and further conclude that the administrative remedies set forth in the Public Utilities Code, and specifically, the rehearing requirement set forth in Public Utilities Code section 1731, do not apply to the PRA and that the PRA fixes the bounds of the CPUC's authority to adopt procedures for PRA requests such as those set forth in General Order 66-D.

A comparison of the procedural provisions of the PRA and the administrative remedy provisions of the Public Utilities Code reinforces the validity of these conclusions.

Upon receipt of a PRA request, an agency must, within 10 days, "determine" whether the request seeks "disclosable" records "in the possession of" the agency. (Gov. Code, § 6253, subd. (c).) This 10-day period can, upon notice to the requestor, be extended to 24 days in a limited set of circumstances specified in the statute. (*Id.,* § 6253, subd. (c)(1)–(4).) Upon making its determination, the agency "shall promptly notify the person making the request of the determination and the reasons therefor."[11] (Gov. Code, § 6253, subd. (c).)

---

[11] Thus, contrary to petitioner's assertion, an agency is not required to both make its determination and give the required notice thereof within 10 or 24 days. If the 10-day (or 24-day) period for making a determination included giving the requisite notification, there would be no reason for the separate statutory requirement that such notification be given "promptly." We generally must " 'give meaning to every word in [a] statute and . . . avoid

13

"When the agency dispatches the determination, and if the agency determines that the request seeks disclosable public records, the agency shall state the estimated date and time when the records will be made available." (Gov. Code, § 6253, subd. (c).) Accordingly, the PRA does not set forth a specific timeframe for actual production of the requested records. However, it states generally that an agency "shall make records promptly available" upon payment of fees associated with their duplication. (*Id.,* § 6253, subd. (b).)

The PRA authorizes any "agency," which includes the CPUC, to "adopt regulations stating the procedures to be followed when making its records available in accordance with this section." (Gov. Code, § 6253.4, subd. (a).) In addition, numerous government entities, including the commission, must "establish written guidelines for accessibility of records" and post such guidelines and make them available on request free of charge. (*Id.*, § 6253.4, subd. (b).) The PRA goes on to specify that "[g]uidelines and regulations adopted pursuant to this section shall be consistent with all other sections of this chapter and shall reflect the intention of the Legislature to make the records accessible to the public." (*Id.*, § 6253.4, subd. (c).)

The PRA additionally spells out the means by which a government entity's decision to withhold records can be challenged in court. Government Code section 6258 provides in pertinent part, "[a]ny person may institute proceedings for injunctive relief or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to

---

constructions that render words, phrases, or clauses superfluous.' " (*In re R.C.* (2019) 39 Cal.App.5th 302, 307, quoting *Klein v. United States of America* (2010) 50 Cal.4th 68, 80.) An agency would be well served, however, by striving to give the requisite notice by the end of the period for making a determination, or, at the very least, immediately thereafter.

receive a copy of any public record. . . ." It further states, "[t]he times for responsive pleadings and for hearings in these proceedings shall be set by the judge of the court with the object of securing a decision as to these matters at the earliest possible time." (*Ibid.*)

As the Supreme Court explained in *Times Mirror Co., supra,* 53 Cal.3d at pages 1332–1334, the Legislature amended the PRA in 1984 to allow for judicial review by way of writ "to *speed* appellate review." The sponsors of the legislation sought " 'to correct an injustice they perceived due to . . . the potential for . . . public agencies to delay the disclosure of public documents' " by exploiting delays in the ordinary appellate process. (*Id.* at p. 1335; see *Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 434–435 [public entity cannot file declaratory relief action to ascertain its obligation under the PRA, in part, because such an action would "clearly thwart the Act's purpose of ensuring speedy public access" to disclosable records].)

In short, the PRA calls for the handling of record requests and the resolution of disputes over such requests with alacrity.

The administrative remedies set forth in the Public Utilities Code, and specifically, the provisions governing rehearing, stand in marked contrast. Public Utilities Code section 1731 states that "[a]fter an order or decision has been made by the commission, a party to the action or proceeding, or a stockholder, bondholder, or other party pecuniarily interested in the public utility affected may apply for a rehearing in respect to matters determined in the action or proceeding and specified in the application for rehearing." (Pub. Util. Code, § 1731, subd. (b)(1).) It further provides, as we have recited, that "[a] cause of action arising out of any order or decision of the commission shall not accrue in any court to any corporation or person unless the corporation or person has filed an application to the commission for a

rehearing." (*Ibid.*) Generally, an application for rehearing must be filed within 30 days of the issuance of the challenged decision or order.[12] (*Id.*, § 1731, subd. (b)(1).)

The commission then has up to 60 days to either grant or deny an application for rehearing. (Pub. Util. Code, § 1733, subds. (a) & (b).) Whether or not the challenged order or decision is suspended during this time depends on when the application for rehearing is filed and how quickly the commission acts on the application. (*Ibid.*) If the commission grants the application without "a suspension of the order involved, the commission shall forthwith proceed to hear the matter with all dispatch and shall determine the matter within 20 days after final submission" on rehearing. (*Id.,* § 1734.) In the absence of suspension, there is no timeframe for rehearing and final determination.

Thus, the statutory times specified by the rehearing statutes—which, not even accounting for any rehearing, itself, total at a minimum at least 70 days (10 days to file application for rehearing, 60 days to decide whether to rehear the matter, 20 days to issue decision on rehearing) and more commonly at least 110 days (30 days to file application for rehearing, 60 days to decide whether to rehear the matter, 20 days to issue decision on rehearing)—cannot be squared with the procedural provisions of the PRA mandating that agencies respond to requests within a much tighter timeframe.

In addition, Public Utilities Code section 1756 states in pertinent part that, "[w]ithin 30 days after the commission issues its decision denying the

---

[12] In some specified instances, an application for rehearing must be filed within 10 days of issuance of the challenged order or decision. (Pub. Util. Code, § 1731, subds. (b)(1), (c), (d).)

16

application for a rehearing, or, if the application was granted, then within 30 days after the commission issues its decision on rehearing . . . any aggrieved party may petition for a writ of review . . . for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined." (Pub. Util. Code, § 1756, subd. (a).) Thus, an application for rehearing under Public Utilities Code section 1731 is linked to a *writ of review*—the means by which decisions of the CPUC are typically subject to judicial review. (See, e.g., *Consumers Lobby, supra,* 25 Cal.3d at pp. 901–905; *BullsEye Telecom, Inc. v. California Public Utilities Com.* (2021) 66 Cal.App.5th 301, 308–309; *San Pablo Bay Pipeline Co., LLC v. Public Utilities Com.* (2015) 243 Cal.App.4th 295, 308–309.)

In contrast, judicial review under the PRA is by way of a complaint for injunctive or declaratory relief, or a petition for a writ of ordinary mandamus, *not* by way of a petition for a writ of review. (Gov. Code, § 6258.)

In sum, the procedural scheme, and specifically the rehearing process, set forth in the Public Utilities Code is not only entirely different than, it is at odds with, the procedural provisions of the PRA and the Legislature's intent in enacting them.

In concluding that the rehearing requirement set forth in Public Utilities Code section 1731 and, in turn, the holdings of *Clemmons* and *Consumers Lobby,* do not apply to the PRA, we are *not* concluding that the CPUC cannot adopt procedures governing PRA requests that include an administrative remedy. Rather, any such non-statutory, non-jurisdictional remedy must comport with the PRA and ensure the expeditious handling of record requests and timely resolution of disputes over whether records are disclosable.

Assuming for purposes of analysis that the administrative appeal process available to petitioner could have been implemented in a manner consistent with the PRA, we turn to whether any exception to the exhaustion doctrine permitted him to seek judicial review prior to any action by the commission on his appeal. The delay that occurred here was egregious by any measure—seven months passed from the time the commission accepted his administrative appeal until he filed his writ petition. We conclude petitioner was not required to wait any longer before seeking judicial review. Indeed, it is well-established that the exhaustion of administrative remedies is excused where, as here, "the administrative procedure is too slow to be effective" (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609 (*City of San Jose*); *Los Angeles County Employees Assn. v. County of Los Angeles* (1985) 168 Cal.App.3d 683, 686–687 ["speedy decision was necessary and not possible under the relatively elaborate . . . procedures" set forth in county's rules and regulations]) and where " ' "the agency indulges in unreasonable delay." ' "[13] (*SJCBC LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 346; *Green, supra,* 194 Cal.App.3d at p. 222).

We therefore conclude that, in this case, petitioner is excused from exhausting administrative remedies.

---

[13] We note, however, that in his administrative appeal, petitioner did not advance the ground of error he now advances in this writ proceeding— that the commission misapplied the Governor's correspondence exemption. Rather, he raised this asserted error for the first time four months later, in his letter to the commission complaining about the time it was taking to rule on his appeal. Accordingly, the commission can hardly be faulted for not addressing this ground prior to receiving his letter.

### B. Mootness

We next turn to the CPUC's assertion that its approval of Resolution No. L-612 nearly a year after petitioner filed his administrative appeal, moots this writ proceeding. Petitioner contends otherwise, pointing out that he has, since the outset of this proceeding, challenged the merits of the CPUC's denial of his PRA requests, which this court has not yet addressed.

We agree with petitioner. In his writ petition, he alleged that his administrative appeal had been "constructively denied" due to the lapse of time. He additionally alleged that the Governor's correspondence exemption does not apply, and he sought a writ compelling the commission to immediately disclose the requested records, not a writ compelling the CPUC to act on his administrative appeal. Accordingly, the CPUC's eventual denial of his administrative appeal has not mooted the issues tendered by his petition.

In any case, even if this original proceeding were moot, we would exercise our discretion to address the merits of the petition. (See *In re Schuster* (2019) 42 Cal.App.5th 943, 951–952 [" 'if a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot' "].)

### C. The Governor's Correspondence Exemption

We now turn to the substantive issue before us—whether the CPUC correctly concluded the records petitioner seeks are statutorily exempt from disclosure under the Governor's correspondence exemption (Gov. Code, § 6254 subd. (l)) and/or the "deliberative process" privilege (*id.*, § 6254, subd. (k), *id.*, § 6255, subd. (a)). As we shall explain, we conclude the records are statutorily exempt under the Governor's correspondence exemption and

19

therefore need not, and do not, consider the applicability of the deliberative process privilege.

The Governor's correspondence exemption exempts from disclosure "the following records: [¶] . . . [¶] (l) Correspondence of and to the Governor or employees of the Governor's office or in the custody of or maintained by the Governor's Legal Affairs Secretary."[14]  (Gov. Code, § 6254, subd. (l).)

Petitioner maintains the exemption is "limited exclusively to correspondence sent to the Governor's Office 'by correspondents outside of government' "—in other words, that the exemption applies solely to correspondence to the Governor and/or his or her staff from private parties. (Boldface omitted.)  Indeed, he claims the California Courts of Appeal have "thrice" so held.  Since the correspondence he seeks—between Batjer and/or her principle executive staff, and the Governor's staff—is not correspondence from a party "outside the government," petitioner asserts the exemption necessarily does not apply.  (Boldface & capitalization omitted.)

Petitioner is in error as to the state of the case law.  No California court has held that the Governor's correspondence exemption is limited to correspondence from private parties.

In *First Amendment Coalition,* the case on which petitioner primarily relies, the Court of Appeal addressed the "narrow issue" of whether the Governor was compelled under the PRA "to disclose the names and qualifications of applicants for a temporary appointment to a local board of supervisors."  (*First Amendment Coalition, supra,* 67 Cal.App.4th at p. 164.)

---

[14]  The exemption further provides, "public records shall not to be transferred to the custody of the Governor's Legal Affairs Secretary to evade the disclosure provisions of this chapter."  (Gov. Code, § 6254, subd. (l).)

The party requesting records wanted, specifically, the candidates' application forms, maintaining a "form" was not "correspondence." (*Id.* at p. 168.)

The Court of Appeal disagreed, stating the requestor's view "would emasculate the exemption" and the court "was not disposed to so formalistic a resolution of the issue." (*First Amendment Coalition, supra,* 67 Cal.App.4th at p. 168.) The court concluded the "letters and application forms received by the Governor's office from applicants for appointment to the vacant supervisor position" were exempt. (*Id.* at p. 169.)

In the course of so concluding, the court stated, "[i]n our view, the correspondence exemption was intended to protect communications to the Governor and members of the Governor's staff from correspondents outside of government." (*First Amendment Coalition, supra,* 67 Cal.App.4th at p. 168.) This is the language petitioner insists constitutes a holding that the exemption applies only to correspondence from private parties.

To begin with, looking solely at the language the court employed, the court did *not* say the exemption applies solely to correspondence from private parties. Rather, the court made an affirmative statement that the exemption *does* apply to correspondence from private parties—a proposition wholly in keeping with the statutory language that excludes "[c]orrespondence . . . to the Governor or employees of the Governor's office" (Gov. Code, § 6254, subd. (l)), and a proposition with which we entirely agree. Further, the court's statement makes perfect sense given that the correspondence at issue was correspondence *from*, and specifically application forms submitted by, *private* parties. The court was not called upon to make, nor did it make, any other pronouncement as to the scope of the exemption.

The appellate court also contrasted the correspondence and accompanying application forms before it, with the "calendars and scheduling

21

materials" at issue in *Times Mirror Co.* (*First Amendment Coalition, supra,* 67 Cal.App.4th at p. 168.) In *Times Mirror Co.,* our Supreme Court considered whether the Governor's "daily, weekly and monthly appointment calendars" were exempt from disclosure under the correspondence exemption and/or the deliberative process privilege. (*Times Mirror Co., supra,* 53 Cal.3d at p. 1329.)

The Governor urged the court to construe "correspondence" to mean any "written communications," which would, in turn, embrace any communications between his scheduling secretary and members of his staff, which would, in turn, include his personal calendars. (*Times Mirror Co., supra,* 53 Cal.3d at pp. 1329, 1337.)

In rejecting this definition of "correspondence," the court pointed out that prior to 1975, the PRA exempted from disclosure "*all* records '[i]n the custody of or maintained by the Governor or employees of the Governor's office employed directly in his office,' " but in that year, the PRA was amended to "limit the exemption to *correspondence* of or to the Governor and his staff." (*Times Mirror Co., supra,* 53 Cal.3d at p. 1337.) "The Governor's suggested definition of correspondence," said the court, was "so broad as to encompass nearly every document generated by the Governor's office, effectively reinstating the original exemption and rendering the 1975 amendment a nullity." (*Ibid.*) The court similarly rejected the Governor's alternative proposal that "correspondence" be defined as "written communications 'directed to an identifiable person or person for the purpose of establishing contact with the recipient.' " (*Ibid.*) "Even under this definition," said the court, "the exception would swallow the rule." (*Ibid.*)

The high court therefore concluded the correspondence exemption "must be confined to communications by letter," a definition the Governor's

22

appointment calendars and schedules "plainly" did not meet. (*Times Mirror Co., supra,* 53 Cal.3d at p. 1337.) The court went on to conclude the calendars and schedules came within the "deliberative process privilege" and were therefore exempt under another provision of the PRA. (*Id.* at pp. 1339–1346.)

Notably, nothing in the Supreme Court's discussion of the Governor's correspondence exemption suggests it is limited to correspondence from private parties. Rather, the court held only that the Governor's calendars and schedules were not "correspondence" within the meaning of the PRA. Accordingly, the fact the *First Amendment Coalition* court contrasted the correspondence and applications before it, with the Governor's "internally generated" personal calendars and schedules at issue in *Times Mirror Co.* (*First Amendment Coalition*, *supra*, 67 Cal.App.4th at p. 168), does not amount to even a hint, let alone constitute a holding, that the Governor's correspondence exemption applies only to correspondence from private parties.

The second case petitioner cites is *American Civil Liberties Union of Northern California v. Superior Court* (2011) 202 Cal.App.4th 55 (*American Civil Liberties*). In that case, a different division of this court considered whether the Department of Corrections could withhold the "identities of approximately 12 pharmaceutical distributors and other entities from which it sought to obtain sodium thiopental" for use in executions and whether the department could redact from otherwise disclosable public records, information not sought by the PRA requests at issue. (*Id.* at pp. 62, 65.) The court answered both questions in the negative. (*Ibid.*) As is immediately apparent without further discussion, the Court of Appeal was not asked to decide any issue having to do with the Governor's correspondence exemption.

23

In the procedural background section of its opinion, the court recited that the trial court had not allowed the department to "withhold internal communications" under the Governor's correspondence exemption "because, as stated in *California First Amendment* . . . , that exception is 'intended to protect communications to the Governor and members of the Governor's staff from correspondents outside of government' and was therefore inapplicable to the documents petitioner sought." (*American Civil Liberties, supra,* 202 Cal.App.4th at p. 65.) This one-sentence procedural recitation of an aspect of the trial court's order that was not challenged on appeal, was *not* a holding by the appellate court. Moreover, as we have discussed, *California First Amendment* did not hold that the Governor's correspondence exemption applies solely to correspondence from private parties.

Petitioner additionally cites to *Marylander v. Superior Court* (2000) 81 Cal.App.4th 1119 (*Marylander*). This was not a PRA case at all, but rather was a writ proceeding challenging a discovery ruling in a civil action. (*Id.* at p. 1121.) The petitioner sought the production of memoranda prepared by officials of the Office of Statewide Health Planning and Development (OSHPD) that were directed to the Governor and concerned the financial condition of an entity that had purchased two hospitals with loans guaranteed by the OSHPD. (*Id.* at p. 1122.) The trial denied a motion to compel on the ground the documents came within the Governor's correspondence exemption. (*Id.* at p. 1121.) The appellate court reversed—not on any ground pertaining to the scope of the exemption, but because PRA exemptions have no application to civil discovery. As the court explained, "a party to pending litigation has a stronger and different type of interest in disclosure." (*Id.* at pp. 1125, 1130, italics omitted.) Accordingly, "[t]he exemptions contained in the Public Records Act simply do not apply to the

24

issue whether records are privileged *in pending litigation* so as to defeat *a party's* right to *discovery*." (*Id.* at p. 1125.) Thus, to the extent the trial court had relied on the Governor's correspondence exemption to foreclose discovery, the appellate court held it had erred and remanded for the lower court to re-evaluate the request under the proper discovery standard. (*Id.* at p. 1129.) Thus, *Marylander* has no bearing on the issue before us.[15]

We therefore turn to the language of the statute, the starting point of any interpretive analysis. " ' "In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms." ' " (*Goals for Autism v. Rosas* (2021) 65 Cal.App.5th 1041, 1046 (*Goals for Autism*), quoting *Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 (*Phelps*); *Kaanaana v. Barrett Business Services* (2021) 11 Cal.5th 158, 168 (*Kaanaana*) [" 'If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' "].)

The pertinent statutory language exempts from disclosure "the following records: [¶] . . . [¶] (l) Correspondence of and to the Governor or employees of the Governor's office or in the custody of or maintained by the Governor's Legal Affairs Secretary." (Gov. Code, § 6254, subd. (l).) Thus, by its plain terms, this exemption exempts any communication "of," as well as "to," the Governor and his or her staff that qualifies as "correspondence." The

_____

[15] Petitioner also improperly cites to unpublished orders in a case before another division of this court and in two superior court cases that he claims follow the "holding" of *California First Amendment* that the Governor's exemption applies only to correspondence from private parties. These citations are patently improper and we disregard them. (Cal. Rules of Court, rule 8.1115.)

term "correspondence" is not modified or limited in any respect, let alone to *private party* correspondence and, further, to correspondence *from* private parties. Indeed, we would need to excise existing language from the statute, as well as read limiting language into it, in order to curtail its scope in the manner petitioner advocates.

The courts, however, " ' "may not add to or detract from a statute or insert or delete words to accomplish a purpose that does not appear on its face or from its legislative history." ' " (*Goals for Autism, supra,* 65 Cal.App.5th at p. 1046, quoting *Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 529.) Rather, " ' " '[w]e are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." ' " ' " (*Goals for Autism,* at p. 1046, quoting *Phelps, supra,* 16 Cal.4th at p. 32.) Thus, in *Haynie v. Superior Court* (2001) 26 Cal.4th 1061 (*Haynie*), for example, the Supreme Court refused to read into another PRA exemption (for "[r]ecords of . . . investigations" by a law enforcement agency (Gov. Code, § 6254, subd. (f))), a "proposed limitation" that found "no support in the statute." (*Haynie,* at pp. 1070–1071.)

Accordingly, in our view, the exemption applies, as it states on its face, to any correspondence "of and to" the Governor or his or her staff, and the critical issue is whether a written communication to or from the Governor or his or her staff, is "correspondence" or some other form of written communication. (See *Times Mirror Co., supra,* 53 Cal.3d at pp. 1336–1337 [Governor's calendars and schedules were not "correspondence"]; *First Amendment Coalition, supra,* 67 Cal.app.4th at pp. 167–169 [form applications submitted to Governor's office following exchange of letters between prospective applicants and Governor's secretary, were "correspondence"].) Where " 'the statutory language is clear and

26

unambiguous, our task is at an end, for there is no need for judicial construction.' " (*Webster v. Superior Court of San Bernardino County* (2020) 51 Cal.App.5th 676, 680, quoting *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082–1083.)

Even if we were of the view that the language of the exemption is ambiguous and in need of construction, which we are not, the legislative history of the exemption reinforces that it should be read and applied as written.

As our Supreme Court observed in *Times Mirror Co.*, prior to 1975, the "Act exempted from disclosure *all* records '[i]n the custody of or maintained by the Governor or employees of the Governor's office employed directly in his office.' " (*Times Mirror Co., supra,* 53 Cal.3d at p. 1337.) In that year, the PRA was amended through legislation (Assem. Bill No. 23 (1975–1976 Reg. Sess.)) that not only added the Governor's correspondence exemption but also established a separate public records act applicable to the Legislature—the Legislative Open Records Act (LORA) (Gov. Code, § 9071 et seq.). (See generally *The Zumbrun Law Firm v. California Legislature* (2008) 165 Cal.App.4th 1603, 1617–1618 (*Zumbrun*).)

As introduced, Assembly Bill No. 23 (1975–1976 Reg. Sess.) wholly eliminated the existing PRA exemption for records "[i]n the custody of or maintained by the Governor or employees of the Governor's office." (Assem. Bill No. 23 (1975–1976 Reg. Sess.) as introduced on Dec. 2, 1974, § 3, p. 7.) In the second round of amendments to the bill, the exemption was partially restored to exempt records "[i]n the custody of or maintained by the Governor's Legal Affairs Secretary, provided records shall not be transferred to the custody of the Governor's Legal Affairs Secretary to evade the

27

disclosure provisions of this chapter.  (*Id.*, as amend. Feb. 20, 1975, § 3, pp. 7–8, italics omitted.)

The language of the exemption was changed to its present form—to exempt "[c]orrespondence of and to the Governor or employees of the Governor's office or in the custody of or maintained by the Governor's legal affairs secretary, provided public records shall not be transferred to the custody of the Governor's legal affairs secretary to evade the disclosure provisions of this chapter"—in the fourth round of amendments.  (Assem. Bill No. 23 (1975–1976 Reg. Sess.) as amend. April 10, 1975, § 3, pp. 9–10.)

In this same round of amendments, two changes were made to the LORA that are of significance here.  (Assem. Bill No. 23 (1975–1976 Reg. Sess.) as amend. April 10, 1975, § 1.)  The first was a revision to an exemption that had been added to the LORA in the third round of amendments, exempting "[p]ersonal correspondence of and to Members of the Legislature."  (*Id.*, as amend. Mar. 31, 1975, § 1, p. 5.)  In the fourth round of amendments, the word "personal" was deleted, so that the exemption excluded all "[c]orrespondence of and to individual Members of the Legislature and their staff."  (*Id.*, as amend. April 10, 1975, § 1, p. 5; Gov. Code, § 9075, subd. (h).)  The second significant change was the addition of an exemption for all "[c]ommunications from private citizens to the Legislature." (Assem. Bill No. 23 (1975–1976 Reg. Sess.) as amend. April 10, 1975, § 1, p. 5; Gov. Code, § 9075, subd. (j).)

These PRA and LORA exemptions remained in the legislation without further change and are now codified in the PRA as Government Code section 6254, subdivision (l), and in the LORA as Government Code section 9075, subdivisions (h) and (j).

28

Nothing in the amendment history suggests the correspondence exemptions in either the PRA or the LORA are limited to correspondence from private parties. To the contrary, it is notable that in the LORA, the Legislature removed the "personal" limitation that had been in an earlier version of the legislator correspondence exemption, bringing the LORA correspondence exemption in line with the newly added Governor's correspondence exemption. Further, the Legislature added a separate exemption to the LORA expressly limited to "communications from private citizens," evidencing that the Legislature knows how to limit an exemption in exactly the way petitioner proposes, when it intends to do so. The Legislature chose not to include any such language in either the LORA legislator correspondence exemption or the PRA Governor's correspondence exemption. (See *Kaanaana, supra,* 11 Cal.5th 158, 174 [other "enactments demonstrate[d] that the Legislature knew how to limit the definition of public work to construction-type work but knowingly eschewed such a limitation in drafting" the provision at issue]; *People v. Murphy* (2001) 25 Cal.4th 136, 159 [other statutory provisions demonstrated that when Legislature "wants a sentence calculated without consideration of some circumstance, it knows how to use language clearly expressing that intent"].)

Petitioner maintains that the fact the Legislature included a separate "communications from private citizens to the Legislature" exemption in the LORA but not in the PRA, "actually proves" the Governor's correspondence exemption in the PRA must be so limited. He contends the differences in the two acts reflect an intent "to treat the Governor's office *differently* from the Legislature," and therefore, as best we can understand his argument, the fact that the Legislature provided itself with a separate, additional exemption for "communications from private citizens" is of no consequence when it comes to

29

determining the Legislature's intent relative to the Governor's correspondence exemption.

To begin with, petitioner's argument is contrary to the fundamental principles of statutory construction we have just discussed.

It also fails to take account of the fact that the PRA and the LORA "correspondence" exemptions are distinctly different from the LORA "communications from private persons" exemption. The correspondence exemptions pertain to persons who can and do author and read correspondence, namely the Governor and his or her staff and individual legislators and their staff. These exemptions also exempt only a subset of communications, specifically correspondence. In contrast, the "communications from private persons to the Legislature" exemption in the LORA exempts all forms of communications directed to a body politic, namely the Legislature. Given the large number of constituents and special interest groups who participate in the legislative process, not only by corresponding with particular legislators, but also by testifying before legislative committees and subcommittees, the Legislature's perceived need for an exemption for "communications" by "private persons" to the "Legislature" is understandable. Given the different character of the Governor's Office, it is equally understandable that the Legislature would have been of the view that no similar exemption for communications by private persons to the Governor's Office, as a body incorporate, was necessary.

Turning to the bill analyses and committee reports, they, like the amendment history, reflect no intent that the correspondence exemptions in either the PRA or the LORA are limited to correspondence from private parties. (E.g., Legis. Analyst, analysis of Assem. Bill No. 23 (1975–1976 Reg. Sess.) as amend. April 10, 1975, pp. 2–4 [bill establishes "exceptions

30

respecting the public disclosure of records," (underscoring omitted) including "[i]f the document sought is correspondence of and to the Governor or employees of the Governor's Office . . .", and "[c]orrespondence of and to members of the Legislature"]; Unfinished Business, conc. in Sen. Amend., Assem. Bill No. 23 (1975–1976 Reg. Sess.) as amend June 17, 1975 [bill "does not require disclosure of correspondence of and to the Governor or his employees or records maintained by the Governor's Legal Affairs Secretary"].)

The Enrolled Bill Report prepared by the State Water Resources Control Board /Environmental Quality Agency is particularly illuminating and made the following comments about the Governor's correspondence exemption:  "Existing law (the CPRA) exempts from the duty to disclose those records that are 'in the custody of or maintained by the Governor or employees of the Governor's office employed directly in his office'.  This bill would amend that exemption to read: 'correspondence of and to the Governor or employees of the Governor's Office or in the custody of or maintained by the Governor's legal affairs secretary.'  The effect of this change in lanaguage is not completely clear.  The term 'correspondence of and to the Governor . . .' is very broad, but it must be interpreted as describing a class of records less general than the existing CPRA exemption, viz., records generally that are 'in the custody of or maintained by the Governor[.] . . .'  An obvious example of records that would be exempt under existing law, but probably not exempt under this bill, would be memoranda physically prepared or dictated by the Governor for his own record, i.e., not as correspondence to another." (Enrolled Bill Report, Environmental Quality Agency, State Water Resources Control Board, Assem. Bill No. 23 (1975–1976 Reg. Sess.), pp. 1–2.)

The Enrolled Bill Report prepared by the Office of the Secretary observed: "The provisions of the bill applying to the Legislature are very

similar to the existing Public Records Act. Most of the definitions and exceptions are the same. Subtle but important differences appear in the exceptions. The bill would exempt legislative memoranda for the Legislature[16] but not for the Governor. It would exempt preliminary drafts and notes for the Legislature without the qualification that appears in the Public Records Act limiting the exception to memoranda which are not retained in the ordinary course of busines provided that the public interest in disclosure [*sic*].[17] This qualification makes the exception for executive departments and the Governor's Office very narrow while the simple exception for legislative offices is extremely broad." (Enrolled Bill Report, Office of the Secretary, Assem. Bill No. 23 (1975–1976 Reg. Sess.), p. 1.)

The report went on to comment that the "problems" presented by the bill "arise from the differences" in disclosure obligations between "the Legislative Branch and the Executive Branch. . . . The problem comes in opening up all records in the Governor's Office except for correspondence of and to the Governor or employees to [*sic*] the Governor's Office and except for records in the custody of the Legal Affairs Secretary. This denies to the Governor's Office protection which the Legislature has preserved for itself." (Enrolled Bill Report, Office of the Secretary, Assem. Bill No. 23 (1975–1976

---

16 This LORA exemption excludes from disclosure: "Preliminary drafts, notes, or legislative memoranda, except as provided in Section 9080." (Gov. Code, § 9075, subd. (a).) Section 9080 requires legislative committees to retain records that constitute legislative history materials. (*Id.*, § 9080, subds. (a) & (b).)

17 The PRA exemption excludes from disclosure: "Preliminary drafts, notes, or interagency or intra-agency memoranda that are not retained by the public agency in the ordinary course of business, if the public interest in withholding the records clearly outweighs the public interest in disclosure." (Gov. Code, § 6254, subd. (a).)

Reg. Sess.), pp. 2–3.)  For example, while the bill exempts "legislative memoranda," there is no "similar specific exemption for the Governor's Office," and "a court would probably find that legislative memoranda in the Governor's Office would be [a disclosable] public records."  (*Id.* at p. 3.)

Thus, what the legislative history discloses is that the Legislature curtailed the formerly broad exemption for *all records* "[i]n the custody of or maintained by the Governor or employees of the Governor's office employed directly in his office . . ." (Assem. Bill No. 23 (1975–1976 Reg. Sess.) as introduced Dec. 2, 1974, § 3, p. 7) by limiting the exemption to "*[c]orrespondence* of and to the Governor or employees of the Governor's office or in the custody of or maintained by the Governor's legal affairs secretary." (*Id.*, as amend. April 10, 1975, § 3, p. 9, italics omitted.)  This was a significant curtailment of the then existing all-records exemption, and there is no indication whatsoever in the legislative history that the Legislature intended to further limit "correspondence" to only that to the Governor's office from private parties.

On the contrary, as the Enrolled Bill Reports indicate, the correspondence exemptions were viewed as being "very broad" (Enrolled Bill Report, Environmental Quality Agency, State Water Resources Control Board, Assem. Bill No. 23 (1975–1976 Reg. Sess.), p. 2), and the issue that was anticipated would come before the courts is whether a particular writing sent to, or generated by, the Governor and/or his or her staff is "correspondence," as opposed to some other category of written communication, such as a memorandum dictated by the Governor for his or her personal use (*ibid.*), "preliminary drafts and notes" prepared by the Governor's Office on pending legislation (Enrolled Bill Report, Office of the Secretary, Assem. Bill No. 23 (1975–1976 Reg. Sess.), p. 1), "legislative

memoranda" prepared by the Governor's office (*id.* at p. 3), or personal calendars and schedules prepared for the Governor by his or her staff. (*Times Mirror Co., supra*, 53 Cal.3d at pp. 1336–1337.)

We therefore conclude, not only in light of the exemption's plain language, but also its legislative history, that the Governor's exemption in the PRA is not limited, as petitioner advocates, to correspondence from private parties, but applies to any writing "of and to" the Governor and his or her staff that qualifies as "correspondence" under the Act.[18] (See *Times Mirror Co., supra*, 53 Cal.3d at pp. 1336–1337; *First Amendment Coalition, supra,* 67 Cal.App.4th at pp. 168–173.)

Petitioner urges that only his proffered reading of the Governor's exemption comports with the directive of article I, section 3 of our state constitution that "a statute . . . shall be . . . narrowly construed if it limits the right of access" to public meetings and records. (Cal. Const. art I, § 3, subd. (b)(2).) Not only was this provision added to our constitution in 2004, long after enactment of the PRA and the exemptions at issue, but it also expressly states "[t]his subdivision does not repeal or nullify, expressly or by implication, any constitutional or statutory exception to the right of access to

---

[18]  We are not called on to decide, nor are we deciding, whether the proviso pertaining to records "in the custody of or maintained by the Governor's Legal Affairs Secretary" is limited to correspondence or includes other public records, as well. (See Enrolled Bill Report, Office of the Secretary, Assem. Bill No. 23 (1975–1976 Reg. Sess.), p. 2.; *Ibid.* [bill "would also exempt correspondence of and to the Governor or employees of the Governor's Office, *and* records in the custody of or maintained by the Governor's Legal Affairs Secretary.  The bill provides that public records shall not be transferred to the custody of the Governor's Legal Affairs Secretary in order to evade the disclosure provisions of the bill."  Italics added.].)

34

public records." (*Id.*, § 3, subd. (b)(5).) Thus, we properly focus here on the language and legislative history of the statutory exemption at issue.

The Governor's correspondence exemption is one of several exemptions—such as the exemptions for "[p]reliminary drafts, notes, or interagency or intra-agency memoranda that are not retained by the public agency in the ordinary course of business" on a sufficient showing of interest in their nondisclosure (Gov. Code, § 6254, subd. (a)), and "[r]ecords, the disclosure of which is exempted or prohibited pursuant to" any evidentiary privilege (*id.*, § 6254, subd. (k)), as well as the "catchall" exemption for records in specific cases where the interest in nondisclosure "clearly outweighs" the interest in disclosure (*id.,* § 6255)—that are "grounded in the unromantic reality of politics" and "rest[] on the understanding that if the public and the Governor were entitled to precisely the same information, neither would likely receive it. Politics is an ecumenical affair; it embraces persons and groups of every conceivable interest: public and private; popular and unpopular; Republican and Democratic and every partisan stripe in between; left, right and center. To disclose every private meeting or association of the Governor and expect the decisionmaking process to function effectively, is to deny human nature and contrary to common sense and experience." (*Times Mirror Co., supra,* 53 Cal.3d at p. 1345, italics omitted; see *Haynie, supra,* 26 Cal.4th at p. 1064 [while the PRA furthers the public's important interest in access to information, "[a]t the same time, the act recognizes that certain records should not, for reasons of privacy, safety, and efficient government operation, be made public"].)

Indeed, as the high court pointed out in *Times Mirror Co.,* the Freedom of Information Act (FOIA), on which the PRA was modeled, exempts in a single provision both " 'inter-agency and intra-agency memorandums or

*letters* which would not be available by law to a party other than an agency in litigation with the agency' " (*Times Mirror Co.*, *supra,* 53 Cal.3d at pp. 1338, 1340, fn. 11, italics added), and "Congress's main concern" in enacting this provision "was that 'frank discussion of legal or policy matters' might be inhibited if 'subjected to public scrutiny,' and that 'efficiency of Government would be greatly hampered' if, with respect to such matters, government agencies were 'forced to "operate in a fishbowl." ' " (*Id.* at p. 1340, quoting *EPA v. Mink* (1973) 410 U.S. 73, 87,[19] quoting from Sen.Rep. No. 813, 89th Cong., 1st Sess., p. 9.)

Thus, while petitioner rightly emphasizes the public interest in ready access to public records, the Legislature has also recognized, and protected, competing public interests in the robust exchange and deliberative consideration of information during the governing process in both the executive and legislative branches. Where the divide should be drawn in accommodating these varying interests is certainly a fair matter of debate. But the Legislature has drawn the line as to "[c]orrespondence of, and to the Governor or employees of the Governor's office" in no uncertain terms, and further debate as to the soundness of this accommodation of interests is properly one had in the legislative, rather than judicial, domain.

We now turn to petitioner's apparent view that "correspondence" for purposes of the PRA does not include communications composed or transmitted by way of e-mail or texts—the sole point raised in his administrative appeal, but not one he has pressed with any specificity in this writ proceeding. In *Times Mirror Co.,* after rejecting the Governor's proffered

---

[19] Superseded by statute on other grounds as stated in *C.I.A. v. Sims* (1985) 471 U.S. 159, 189, fn. 5. (conc. opn.).

definitions of "correspondence," the high court, indeed, stated "that for purposes of the Act, the correspondence exemption must be confined to communications by letter." (*Times Mirror Co., supra,* 53 Cal.3d at p. 1337.) However, the court made this pronouncement in 1991—during a different technological era. Correspondence was then still largely formalized and delivered by mail, or when speed was necessary, by FAX. It is now three decades later, and we would be ignoring present reality were we to agree with petitioner's initial take on the correspondence exemption and conclude it applies only to correspondence drafted and delivered through now near-archaic means. (See *First Amendment Coalition, supra,* 67 Cal.App.4th at p. 168 [despite "written letter" language of *Times Mirror Co.*, court was "not disposed to so formalistic a resolution of the issue"].)

The import of the Supreme Court's holding in *Times Mirror Co.* is that there is a qualitative distinction between "communications"—a term "so broad as to encompass nearly every document generated by the Governor's office" (*Times Mirror Co., supra,* 53 Cal.3d at p. 1337)—and "correspondence," and that only records of the latter sort come within the exemption. Thus, the salient question in the wake of *Times Mirror Co.*, is whether a communication is fairly characterized as correspondence or some other form of written communication, such as a calendar or schedule, a private memo dictated and used solely by the Governor, or a legislative analysis prepared by and for the use of the Governor's office.

This brings us to whether our holding as to the scope of the Governor's correspondence exemption resolves the instant writ proceeding.

As we have discussed, in his PRA requests petitioner sought only communications "between" Batjer and/or her senior executive staff, and certain members of the Governor's staff.

37

In his administrative appeal, petitioner raised a single objection to the CPUC's denial of his requests—that the Governor's correspondence exemption " 'must be confined to communications by letter,' " citing *Times Mirror Co.* and requesting that the commission disclose "all texts, emails, and calendar entries." Presumably, petitioner included calendar entries in light of the Supreme Court's holding in *Times Mirror Co.* that the Governor's calendars and schedules were not "correspondence" and therefore did not fall within the Governor's correspondence exemption (but did fall within the deliberative process privilege). It is not readily apparent, however, nor has petitioner ever explained, how calendar entries could constitute a communication "between" Batjer and/or her principal executive staff, and the Governor's staff.

It his later letter to the CPUC complaining about the untimely handling of his administrative appeal, petitioner claimed the Governor's correspondence exemption did not apply because it assertedly applied only to correspondence from private parties. As for *Times Mirror Co.,* petitioner made only the following brief, nearly incomprehensible comment—that he had cited "the narrow construction the California Court of Appeals had given subsection 6254(l) in *Times Mirror Co. v. Superior Court,* (1991) 53 Cal.3d 1325, 1337." In any event, other than asserting the correspondence exemption applied only to correspondence from private parties, petitioner made no claim that any of the communications he sought did not otherwise qualify as "correspondence" because they were some other form of written communication.

In his writ petition, the only assertion petitioner made with respect to the Governor's correspondence exemption was that it was limited to correspondence from private parties. Again, he made no claim that any of the

communications he sought did not otherwise qualify as "correspondence" under the PRA.

Four months later, the CPUC served petitioner with a copy of its draft resolution, scheduled for action at the next board meeting. He submitted extensive comments, which as to the Governor's correspondence exemption, reiterated the arguments he previously advanced in his correspondence to the CPUC and in his writ petition filed in this court. That is, he continued to urge that the Governor's correspondence exemption applies only to correspondence to the Governor's Office from private parties.

The commission's final resolution addressed and rejected petitioner's position as to the scope of the exemption and concluded the exemption applied to the communications sought "between" Batjer and/or her principle executive staff and the Governor's staff. The resolution states, petitioner "is not seeking internal CPUC communications; nor is he requesting of the Governor's Office its internal communications; he is seeking 'correspondence of and to the Governor or employees of the Governor's Office,' which request falls squarely under the plain wording of the exception."

In its return, the CPUC reiterated the points made in its resolution as to the Governor's exemption.

In his reply, petitioner continued to maintain, as stated in his argument heading, that "The 'Governor's Correspondence Exemption' Does Not Apply to Intergovernmental Communications; It Has Been Judicially Limited to Correspondence Sent *to* the Governor's Office by Private Citizens 'Outside of Government.' " (Boldface omitted.) He thus concluded, "[b]ecause all of the public records sought by Petitioner Rittiman were exchanged between two government offices, not sent *to* the Governor's office 'from correspondents outside of government,' [Government Code] section 6254(l) . . .

39

does not apply to any of them." Again, petitioner made no claim that the records sought do not otherwise qualify as "correspondence" under the exemption because they are some other kind of written communication.

Thus, as petitioner has presented his case to us, it rises or falls on his claim that the Governor's exemption should not be applied according to its plain terms, but should be judicially rewritten to apply solely to correspondence from private parties. He has made no claim that the records he seeks—of "exchanges" between Batjer and/or her principle executive staff, and the Governor's staff—do not otherwise qualify as "correspondence" under the PRA. Since we have rejected his claim as to the scope of the correspondence exemption, we need not proceed further.[20]

## III.   DISPOSITION

The CPUC's demurrer to the petition for writ of mandate is sustained without leave to amend on the ground the records petitioner seeks are exempt from disclosure under the Governor's correspondence exemption (Gov. Code, § 6254, subd. (l)). This proceeding is therefore dismissed.

---

[20] We therefore need not, and do not, reach any issue as to the applicability of the deliberative process privilege.

40

_____
                                                    Banke, J.


We concur:


_____
Humes, P.J.


_____
Margulies, J.

Counsel:

Law Office of Steven D. Zansberg, LLC, Steven David Zansberg for Petitioner.

David Arthur Urban, Suzanne Solomon, Rachel Ann Peterson, Kathleen Sue Chovan, Keenan Patrick O'Connor and Christofer Charles Nolan for Respondent.